**Bruce BUCKLES; Linda Buckles; and Alvin Banks, Plaintiffs–Appellants,**

v.

**KING COUNTY, a political subdivision of the State of Washington; Joseph W. Tovar; Chris Smith Towne; M. Peter Philley, Defendants–Appellees.**

No. 98–35270

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 15, 1999.

Filed Sept. 10, 1999.

---

**1130**

Richard M. Stephens, Esq., Groen & Stephens, Bellevue, Washington, for the plaintiffs-appellants.

H. Kevin Wright and Darren Carnell, King County Prosecuting Attorney's Office, Seattle, Washington, for defendant-appellee King County; Marjorie T. Smitch and Richard A. Heath, Office of the Attorney General, Olympia, Washington, for defendants-appellees Joseph W. Tovar, et al.

Before: REAVLEY,[1] ALARCON, and McKEOWN, Circuit Judges.

McKEOWN, Circuit Judge:

This case arises from a zoning decision, under the Washington Growth Management Act of 1990, to maintain the existing boundary between a residential area and a neighborhood business zone in King County, Washington. Landowners Bruce and Linda Buckles and Alvin Banks appeal from the district court's summary judgment in favor of members of the Growth Management Hearings Board and King County. As a threshold matter, we address whether members of the Washington Growth Management Hearings Board are entitled to absolute immunity from damages. We then decide whether the landowners' procedural due process, substantive due process, and takings claims against King County can withstand summary judgment. Finally, in light of *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, —— U.S. ——, 119 S.Ct. 1624, 143 L.Ed.2d 882 (1999), we consider whether the landowners' takings claim should be tried before a jury. We review the district court's grant of summary judgment de novo. *Margolis v. Ryan*, 140 F.3d 850, 852 (9th Cir.1998). We have

---

1. Honorable Thomas M. Reavley, Senior United States Circuit Judge for the United States Court of Appeals, Fifth Circuit, sitting by designation.

jurisdiction under 28 U.S.C. § 1291 and we affirm.

## BACKGROUND

Appellants Bruce Buckles, his wife, Linda Buckles, and her father, Alvin Banks (collectively, "the Buckles") own an approximately 10–acre piece of property in unincorporated King County, Washington. On the property is a single-family residence, a small guest house, and a barn. A stream that supports salmon spawning crosses the property and is part of an environmentally sensitive riparian corridor. From the time the Buckles bought the property in 1974[2] until this dispute arose in 1994, the property was zoned for residential use. The Buckles have lived on the property since 1979 and have always used it for residential purposes.

The Buckles' property is adjacent to a large residential subdivision and is surrounded on all sides by land zoned for rural residential use. A school and a fire station are nearby. Some neighboring properties, however, are zoned or used for industrial and commercial use. A small neighborhood business center abuts one side of the Buckles' property. A portion of another side of the property is adjacent to a small parcel used for industrial purposes. The surrounding residential area dwarfs the small (approximately nine-acre) business area and the pre-existing commercial properties are like a few small islands in a sea of residential property.

In November 1994, the Buckles received notice that King County was adopting new zoning pursuant to the Washington Growth Management Act of 1990, RCW 36.70A, which requires each county in Washington to adopt a comprehensive land use plan and designate an urban growth area "within which urban growth will be encouraged and outside of which urban growth will be prohibited." See RCW 36.70A.110. King County advised the Buckles that their property would be zoned as residential. More specifically, the notice informed the Buckles of the proposed zoning change to their property from "SE–P" ("Suburban Estates," or residential with a 1–acre minimum lot size) to "RA–5–P" ("Rural Area,"[3] permitting residential use with a 5–acre minimum lot size).[4]

The Buckles hired an attorney, who petitioned the King County Council to designate the Buckles' property "Rural Neighborhood," i.e., for limited retail and commercial use. The Buckles' initial lobbying was successful. On November 17, 1994, the day before the adoption of the King County Comprehensive Plan, which had been developed over several years, the King County Council adopted Amendment 101, which designated the Buckles' property "Rural Neighborhood." In January 1995, the King County Council passed Ordinance 11653 which adopted zoning to implement the comprehensive county-wide plan required by the Growth Management Act. Within the Plan, the Buckles' property was zoned as "Neighborhood Business."[5]

The Comprehensive Plan was challenged on numerous grounds in multiple petitions filed with the Washington Growth Management Hearings Board ("the Board"),

2. One parcel was purchased in 1974 and another was acquired in 1987.

3. The zoning code provides that "[t]he purpose of the rural zone (RA) is to provide for an area-wide long-term rural character and to minimize land use conflicts with nearby agricultural, forest or mineral extraction production districts." King County Code § 21A.04.060. The "-P" suffix refers to "property specific development standards," which "indicate[ ] that conditions beyond the minimum requirements . . . have been applied to development on the property. . . ." King County Code § 21A.04.150.

4. The Buckles did not challenge the change from 1–acre minimum to 5–acre minimum residential use.

5. The zoning code provides that "[t]he purpose of the neighborhood business zone (NB) is to provide convenient daily retail and personal services for a limited service area and to minimize impacts of commercial activities on nearby properties. . . ." King County Code § 21A.04.090.

including a claim that the redesignation of the Buckles' property was adopted in violation of the public participation requirements of the Growth Management Act. The petitions were consolidated into a single proceeding. *Vashon–Maury v. King County,* No. 95–3–0008, at 1245, 1247 (CPSGMHB Oct. 23, 1995). The Board considered procedural challenges to several portions of the plan and concluded that Amendment 101 (designating the Buckles' property for commercial use), along with several other amendments, were invalid because of the absence of public participation and "remanded to [King] County with directions to provide a reasonable opportunity for public comment prior to consideration by the Council of any subsequent re-adoption of such amendments." *Id.* at 1285. The Board did not determine whether the redesignation of the Buckles' property substantively violated the Growth Management Act, but only that the redesignation, in the absence of public participation, was a procedural violation under the Act. *See id.* at 1284, 1285 n. 48. The Buckles were not parties to, and did not receive notice of, this 1995 proceeding before the Board. This lack of notice forms the basis for two of their major grievances in this case. The Buckles were parties to a second proceeding before the Board in 1996, the result of which they also challenge in this appeal.

On remand, King County began new proceedings to reconsider portions of the 1994 Comprehensive Plan in accord with the Board's 1995 decision. The land use designation for the Buckles' property was among the issues reconsidered. Four public hearings were held. Ultimately, the King County Council adopted Ordinance No. 12170 which, among other modifications, designated the Buckles' property "Rural Residential," and classified it as RA–5 for zoning purposes. The ordinance included no less than 16 different amend-

ments to the Plan. The Buckles filed an administrative appeal to the Board challenging the redesignation and the Board rejected the Buckles' appeal. *Buckles v. King County,* No. 96–3–0022, at 10–16 (CPSGMHB Nov. 12, 1996). The Buckles did not appeal the Board's decision directly to the superior court, a right of appeal provided in the Growth Management Act. RCW 36.70A.300(5). Instead, they filed suit in King County Superior Court against King County and the members of the Board, alleging that they were "victims of a zoning change," and stating substantive and procedural due process claims under 42 U.S.C. § 1983. Defendants removed the case to federal court, where the Buckles amended their complaint to add a takings claim under the federal and state constitutions. The district court dismissed the claims against the Board members under the doctrine of quasi-judicial immunity and held that the Buckles could not maintain a federal substantive due process claim under *Macri v. King County,* 126 F.3d 1125, 1129 (9th Cir.1997), because the claim was essentially a takings claim. The district court subsequently granted summary judgment for King County on the Buckles' takings, procedural due process, and state substantive due process claims.

## DISCUSSION

**I. Absolute Immunity for Growth Management Hearings Board Members**

 The first issue is whether members of the Growth Management Hearings Board are protected by absolute immunity from a suit for damages arising out of the Board's ruling on the Buckles' petition.[6] The district court held that the Board members were entitled to absolute immunity. Determination of immunity is a question of law reviewed de novo. *Bennett*

---

**6.** The Board members assert that the suit is also barred by the Eleventh Amendment because the suit is "truly against the Hearings Board," a state agency. The Buckles, however, alleged claims against the Board members

in their personal capacities, thus avoiding the Eleventh Amendment bar. *Hafer v. Melo,* 502 U.S. 21, 25, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991).

*v. Williams,* 892 F.2d 822, 823 (9th Cir. 1989).

The Growth Management Act created three Growth Management Hearings Boards for the State of Washington: an Eastern Washington board, a Western Washington Board, and a Central Puget Sound board. The latter board has jurisdiction over matters pertaining to King County, and thus is the board at issue in this case. RCW 36.70A.250. Each regional board consists of three members "qualified by experience or training in matters pertaining to land use planning." RCW 36.70A.260. Referred to in the Washington Administrative Code as a "quasi-judicial body," WAC 242–04–020, the Board presides over and rules on petitions challenging compliance with the requirements of the Growth Management Act. RCW 36.70A.280(1)(a). If the Board determines that a local government entity (the state, a county, or a city) is not in compliance with the Growth Management Act, the Board remands the matter to the affected entity. RCW 36.70A.300(3)(b). Although comprehensive plans and development regulations are "presumed valid upon adoption," RCW 36.70A.320(1), the Board has the authority to determine that part or all of a comprehensive plan or development regulation is invalid if the Board specifies the reasons for the invalidity and concludes that the "continued validity of part or parts of the plan or regulation would substantially interfere with the fulfillment of the goals of [the Growth Management Act]." RCW 36.70A.302(1).

■ Our analysis of the Board's immunity begins with a central tenet of American jurisprudence-no one is above the law:

> No man in this country is so high that he is above the law. No officer of the law may set that law at defiance with impunity. All the officers of the government from the highest to the lowest, are creatures of the law, and are bound to obey it.

*United States v. Lee,* 106 U.S. 196, 220, 1 S.Ct. 240, 27 L.Ed. 171 (1882). This principle, in turn, requires that a public official seeking "absolute exemption from personal liability for unconstitutional conduct must bear the burden of showing that public policy requires an exemption of that scope." *Butz v. Economou,* 438 U.S. 478, 506, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978). Acknowledging that some officials perform "special functions [requiring] a full exemption from liability," the Supreme Court has long recognized "the need for absolute immunity to protect judges from lawsuits claiming that their decisions had been tainted by improper motives." *Id.* at 508, 98 S.Ct. 2894; *see also Bradley v. Fisher,* 80 U.S. (13 Wall) 335, 20 L.Ed. 646 (1871). This same absolute immunity, often dubbed quasi-judicial immunity, has been extended to agency officials when they perform functions analogous to those performed by judges. *Butz,* 438 U.S. at 511, 98 S.Ct. 2894; *see also Romano v. Bible,* 169 F.3d 1182, 1187–88 (9th Cir.1999) (Nevada Gaming Commission members entitled to absolute immunity for actions taken in conducting disciplinary proceedings involving gaming licensees), *petition for cert. filed,* (May 27, 1999) (No. 98–1906); *Bermudez v. Duenas,* 936 F.2d 1064, 1066 (9th Cir.1991) (parole board officials entitled to absolute immunity for actions taken in deciding to grant, deny or revoke parole).

In determining whether judicial immunity should attend to officials other than judges, like the Board members, the Supreme Court reminds us that

> [t]he doctrine of judicial immunity is supported by a long-settled understanding that the independent and impartial exercise of judgment vital to the judiciary might be impaired by exposure to potential damages liability. Accordingly, the "touchstone" for the doctrine's applicability has been "performance of the function of resolving disputes between parties, or of authoritatively adjudicating private rights." When judicial immunity is extended to officials other than judges, it is because their judgments are "functional[ly] comparab[le]" to those of judges-that is, because they,

too, "exercise a discretionary judgment" as part of their function.

*Antoine v. Byers & Anderson, Inc.*, 508 U.S. 429, 435–36, 113 S.Ct. 2167, 124 L.Ed.2d 391 (1993) (internal citations omitted).

The principle underlying immunity for government officials performing judicial functions is the same as that for judges: "adjudications invariably produce[ ] at least one losing party," *Butz*, 438 U.S. at 509, 98 S.Ct. 2894, and if the losing party in one forum were allowed to maintain a civil action against the decision-maker in another forum, it would threaten the decision-maker's independence. In evaluating the defense of absolute immunity, the court considers whether the "adjudication within a[n] ... administrative agency shares enough of the characteristics of the judicial process that those who participate in such adjudication should also be immune from suit for damages." *Id.* at 513, 98 S.Ct. 2894.

In *Butz*, the Supreme Court identified the following characteristics of the judicial process as sufficient to render the role of the administrative law judge "functionally comparable" to that of a judge: an adversarial proceeding, a decision-maker insulated from political influence, a decision based on evidence submitted by the parties, and a decision provided to the parties on all of the issues of fact and law. *Id.* The Court noted other safeguards built into the judicial process, such as the importance of precedent and the right to appeal, but did not identify these safeguards as dispositive. What mattered was that "federal administrative law requires that agency adjudications contain *many* of the same safeguards as are available in the judicial process." *Id.* at 513, 98 S.Ct. 2894 (emphasis added).

The Board adjudicates land use disputes and functions as a quasi-judicial body; its proceedings reflect the same characteristics of the judicial process identified as sufficient in *Butz*. The Buckles claim that the proceedings were not adversarial because they were not given the opportunity to become a party. This argument confuses the nature of the Board's proceedings with the Buckles' role. That the Buckles were not parties did not render the proceedings non-adversarial. The issue decided by the Board was whether King County's zoning decision on the Buckles' property violated the public participation requirements of the Growth Management Act. On that issue, the petitioners, who were members of a neighborhood community club, and King County took dramatically polar positions. We have little doubt that the proceeding was an adversarial one.

As to the second factor identified in *Butz*-insulation from political influence-Board members are protected in numerous ways. Board members are appointed by the governor for staggered terms of six years and no more than two (of the three) members may be from the same political party or reside in the same county. RCW 36.70A.260. A Board member is prohibited from engaging in any work inconsistent with the duties as a Board member. RCW 36.70A.270. Nor may a Board member run for or hold any other public office. *Id.* Ex parte communication with Board members is prohibited, WAC 242–02–130, and the procedures provide for disqualification of the Board members for bias and prejudice, WAC 242–02–530. These safeguards guarantee the impartiality and independence of Board members.

Further safeguards ensure that the Board base its decision on reliable information. Discovery is not permitted except upon the Board's order, WAC 242–02–410; instead the government is required to disclose to the parties "an index of all material used in taking the action which is the subject of the petition for review," WAC 242–02–520, and any documentary evidence to be offered at the hearing must be submitted in advance to the other parties and the Board. WAC 242–02–52002.

Other procedures that parallel the judicial process are also present: sworn testimony, WAC 242–02–610; use of subpoe-

nas, WAC 242–02–420; the Washington rules of evidence as a non-binding guide, WAC 242–02–650; a decision based on evidence in the record, RCW 36.70A.290; issuance of a written decision, RCW 36.70A.270; and the right to judicial review of a final decision by the Board in superior court. RCW 36.70A.300(5).[7]

The nature and number of safeguards present in proceedings before the Board easily distinguish this case from *Cleavinger v. Saxner*, 474 U.S. 193, 106 S.Ct. 496, 88 L.Ed.2d 507 (1985), which is cited by the Buckles. In *Cleavinger*, the Supreme Court held that prison discipline committee members were not entitled to absolute immunity because of the lack of procedural safeguards in the disciplinary hearings. The Court noted that the discipline committee members were not independent, but "direct subordinates of the warden who reviews their decision" and co-workers of the prison official who "lodges the charge against the inmate upon whom they sit in judgment." *Id.* at 204, 106 S.Ct. 496. Further, the information relied upon by the disciplinary committee was suspect because there was no right to compel the presence of witnesses, cross-examine witnesses, or engage in discovery. *Id.* at 503. And, a prisoner was not entitled to a lawyer or independent representative. *Id.*

The Buckles point to the absence of three procedural safeguards: notice of proceedings before the Board, the indispensable parties doctrine, and the right to appeal. The first and last of these procedural safeguards are built into the Board's proceedings but do not apply here because the Buckles were not a party to the proceedings. *See* WAC 242–02–510 (requiring notice to all parties of a hearing date before the Board); *see also* RCW 36.70A.295

(providing any "aggrieved party" with the right to judicial review of the Board's decision). The Buckles' remaining argument, therefore, is that the absence of the indispensable parties doctrine renders the Board members' functions sufficiently dissimilar from that of judges to make quasi-judicial immunity inappropriate. We find this argument unpersuasive.

In essence, the Buckles' claim is that because they were not parties to the first proceeding before the Board, the Board should be stripped of immunity. This argument ignores the Board's adjudicative function and obscures the true nature of the Board's proceedings here. The Board did not zone or change the zoning of the Buckles' property. Rather, the Board held that King County violated the public participation requirements of the Growth Management Act, invalidated King County Council Ordinance 101, and remanded the matter to King County for further proceedings, including the zoning of the Buckles' property.

■ Nor can the Buckles be saved by their argument that the Board has no indispensable party rule. Even in proceedings before a court, the doctrine of indispensable parties is not absolute, but is subject to the "public rights exception," where, in a proceeding "restricted to the protection and enforcement of public rights, there is little scope or need for the traditional rules governing joinder. . . .'" *Conner v. Burford*, 848 F.2d 1441, 1458–59 (9th Cir.1988) (quoting *National Licorice Co. v. NLRB*, 309 U.S. 350, 363, 60 S.Ct. 569, 84 L.Ed. 799 (1940)). Because so many procedural safeguards are built into the Board's proceedings, we conclude that the absence of the doctrine of indispens-

---

7. We respectfully disagree with the suggestion, in dicta, by the Washington Supreme Court that the procedural safeguards required to satisfy *Butz* are not necessarily present in the "quasi-judicial land use setting." *Lutheran Day Care v. Snohomish County,* 119 Wash.2d 91, 829 P.2d 746, 754–55 (1992) (expressly noting that "we are not deciding that issue"). At least one other federal court of appeals has applied the doctrine of quasi-judicial immunity in the land use context. *See Thomas v. City of Dallas,* 175 F.3d 358, 362–63 (5th Cir.1999) (urban rehabilitation standards board member protected by absolute immunity from damages action arising out of board's erroneous decision to demolish a house).

able parties is not grounds to deny immunity.

The Buckles also argue that the Board members are not entitled to absolute immunity because they perform administrative and executive functions similar to those performed by the Land Conservation and Development Commission commissioners in *Zamsky v. Hansell,* 933 F.2d 677 (9th Cir.1991) (per curiam) (holding that commissioners were not entitled to absolute immunity and remanding for consideration of qualified immunity). Unlike the commissioners in *Zamsky,* who acted as both "lawmaker[s] and monitor[s] of compliance," *id.* at 679, by promulgating the planning standards for local land use plans and then reviewing the comprehensive plans for compliance, the Board members here did not play such a dual role.

■ The Buckles' policy arguments against immunity are at odds with well-established principles of immunity. The Buckles suggest that absolute immunity is unnecessary because the state pays for the Board members' defense and indemnifies them against any judgment. The policy underlying judicial immunity, however, is not protection of judges from monetary loss, but protection from harassment and intimidation, *Butz,* 438 U.S. at 512, 98 S.Ct. 2894, and "discourag[ement of] collateral attacks[,] thereby helping to establish appellate procedures as the standard system for correcting judicial error." *Forrester v. White,* 484 U.S. 219, 225, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988). If Board members were not protected by absolute immunity, we predict that many losing parties would turn around and sue the Board members in a damages action instead of appealing the Board's substantive decision to Superior Court. The decision maker rather than the decision would become the target. Land use decisions are often contentious and involve conflicting interests and policies. Permitting suits against the quasi-judicial decision makers would discourage knowledgeable individuals from serving as Board members and thwart the orderly process of judicial review. Absolute immunity for the Board members serves "the broader public interest in having people perform these functions without fear of having to personally defend their actions in civil damages lawsuits." *Romano,* 169 F.3d at 1188.

In the end, the Buckles' argument on immunity is that it unfairly leaves them without a remedy against the Board. On this point, the Buckles attempt to sidestep their guaranteed right to appeal the Board's decision. The Buckles had a right to direct judicial review of the Board's decision that, after remand, King County complied with the Growth Management Act in designating the Buckles' property Rural Residential. But the Buckles did not appeal this decision. Instead, they filed this suit and therefore waived their right to a remedy for the Board's decision on the merits. We hold that the Board members are entitled to absolute immunity and, therefore, we do not address the Buckles' arguments regarding qualified immunity and their procedural due process claim against the Board.

## II. Claims Against King County

In addition to their claims against the Board members, the Buckles brought several claims against King County for its decision to redesignate the Buckles' property for residential use. The Buckles characterize King County's actions as illegally "downzoning" their property from commercial to residential, despite the fact that the Buckles' property was zoned for residential use for decades and was zoned for commercial use-in the form of a subsequently invalidated amendment to the Comprehensive Plan-for less than a year. The Buckles advance their argument through three different legal challenges: a procedural due process claim, a substantive due process claim, and a takings claim. Within both the substantive due process and takings claims, the Buckles argue that King County engaged in "spot zoning," an oft-criticized theory discussed below.

## A. Procedural Due Process Claim

■ We first consider whether the district court erred in granting summary judgment for King County on the Buckles' procedural due process claim. The Buckles' alleged that, "[t]o the extent the decision to change the zoning was a quasi-judicial act, Plaintiffs were deprived of due process also by not having an impartial decision maker." The Buckles' briefs do not address the merits of their procedural due process claim, nor do they point to any evidence in the record that supports the complaint's conclusory assertion of partiality. The Buckles' procedural due process claim is further lacking because they have not shown that they have a "legitimate claim of entitlement" to the zoning for commercial use created by "an independent source such as state law." *See Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). The Buckles do not even attempt to argue that a last-minute amendment that was subsequently invalidated created a "legitimate claim of entitlement" to commercial zoning. We affirm the district court's summary judgment in favor of King County on the procedural due process claim.[8]

## B. Substantive Due Process Claim

■ We next address whether the district court erred in dismissing the Buckles' substantive due process claim. Whether a general substantive due process claim is trumped by the specific provisions of the Fifth Amendment's Takings Clause is a question falling squarely within our precedent. In what is an "exception to the general rule [that a plaintiff can seek relief under multiple constitutional theories], recognized out of a well-placed reluctance

to expand the concept of substantive due process," a plaintiff is precluded from asserting a substantive due process claim instead of, or in addition to, a takings claim. *Macri v. King County,* 126 F.3d 1125, 1128 (9th Cir.1997) (quoting *Armendariz v. Penman,* 75 F.3d 1311, 1326 (9th Cir.1996) (en banc)) (alteration in original). The en banc court in *Armendariz*

> held that when an explicit textual provision of the Constitution protects against the challenged government action, *the claim must be analyzed under that specific provision alone* and not under the more general guarantee of substantive due process.

*Id.* at 1128 (emphasis added).

The Buckles contend that they do not seek to expand the substantive due process clause, but to apply the law on "spot zoning." Changing the label will not change the result. A spot zoning claim[9]-that an individual piece of property was singled out for zoning incompatible with neighboring property-is variously characterized as a substantive due process violation, a taking, or even an equal protection violation; spot zoning does not neatly fit into one category. *See Save Our Rural Environment v. Snohomish County,* 99 Wash.2d 363, 662 P.2d 816, 819 (1983) ("When faced with a challenge to a county's rezone action on the grounds the rezone constitutes an illegal spot zone, the main inquiry is whether the zoning action bears a substantial relationship to the general welfare of the affected community.").

■ Washington courts have recognized the claim of "spot zoning" and defined it as follows:

---

8. Although the district court dismissed the procedural due process claim on the ground that King County's action in zoning the property on remand was legislative, in light of our holding, we need not determine whether King County's action was legislative or adjudicatory in nature.

9. The term "spot zoning" has been criticized by commentators as a "catchword, not a legal

theory." Grant S. Nelson et al., Contemporary Property 1189 (1996) (noting that "the only thing certain is that if the court labels a rezoning 'spot zoning,' the next words will be 'and void.'"); *see also* Osborne M. Reynolds, Jr., "Spot Zoning–A Spot That Could Be Removed from the Law," 48 Wash. U.J. Ur. & Contemp. L. 117, 122–23 (1995).

Spot zoning has come to mean arbitrary and unreasonable zoning action by which a smaller area is singled out of a larger area or district and specially zoned for a use classification totally different from and inconsistent with the classification of surrounding land, and not in accordance with the comprehensive plan. Spot zoning is a zoning for private gain designed to favor or benefit a particular individual or group and not the welfare of the community as a whole.

*Smith v. Skagit County*, 75 Wash.2d 715, 453 P.2d 832, 848 (1983) (illegal spot zoning to rezone 470 acres of island property from residential-recreational to industrial use).

We affirm the dismissal of the Buckles' substantive due process claim under *Armendariz* and *Macri* because we "must" analyze the Buckles' land use claim under the "explicit textual source of constitutional protection," the Takings Clause, "not the more generalized notion of 'substantive due process.'" *Armendariz*, 75 F.3d at 1324 (internal quotation marks omitted). To the extent that the Buckles' spot zoning claim is a substantive due process claim, it must be dismissed, but to the extent that the claim-whether labeled spot zoning or otherwise-can be characterized as a Fifth Amendment claim, we will address it as a takings issue in the next section of this opinion.

▬ The Buckles argue that, even if the district court appropriately dismissed the Buckles' federal substantive due process claim, the district court should have allowed them to proceed on a state substantive due process claim. The Buckles contend that the Washington Constitution provides greater substantive due process protection than the United States Constitution because the Washington Supreme Court, in a post-*Macri* decision, allowed a substantive due process claim to proceed in a land use case. *See Mission Springs,*

*Inc. v. City of Spokane*, 134 Wash.2d 947, 954 P.2d 250, 257–58 (1998). *Mission Springs* is not controlling, however, because the case does not address whether the Washington Constitution provides greater substantive due process protection than the United States Constitution. Further, because the Buckles did not argue and brief the six factors laid out by the Washington Supreme Court for determining whether the Washington Constitution provides broader rights than the United States Constitution, we do not consider the Buckles' argument that the state constitution offers broader protection.[10] *See State of Washington v. Gunwall*, 106 Wash.2d 54, 720 P.2d 808, 813 (1986) ("Recourse to our state constitution as an independent source for recognizing and protecting the individual rights of our citizens must spring not from pure intuition, but from a process that is at once articulable, reasonable and reasoned."); *see also Guimont v. Clarke*, 121 Wash.2d 586, 854 P.2d 1 (1993) (deciding that because the appellants "have not briefed the relevant *Gunwall* factors necessary for determining whether an independent analysis of the state constitution is proper[,] .... we will analyze only the federal constitution") (internal citation omitted).

**C. Takings Claim**

Finally, we turn to the Buckles' argument that the district court erred in granting summary judgment for King County on their takings claim. The Buckles' takings claim is a facial challenge to the enactment of King County Ordinance 12170, which, among other amendments to the Comprehensive Plan, designated the Buckles' property "Rural Residential." The Buckles argue that the designation "fails to advance a legitimate county interest and thereby takes Plaintiffs' property without payment of just compensation...." They also claim that the ordinance violates the

---

**10.** We note, however, that Washington courts have not found broader protection under the state constitution than under the parallel federal provision. *See e.g. State v. Manussier,*

129 Wash.2d 652, 921 P.2d 473 (1996); *City of Seattle v. McConahy,* 86 Wash.App. 557, 937 P.2d 1133 (1997), *rev. denied,* 133 Wash.2d 1018, 948 P.2d 388 (Wash.1997).

Takings Clause because it changes their zoning from commercial to residential use, an example of "downzoning," upon which courts look critically. This argument is a variation on their spot zoning theory which boils down to a claim that it was unfair, and hence a form of taking, to impose stricter zoning on the Buckles than on their commercial neighbors.[11]

The Buckles' characterization of their takings claim, however, ignores the undisputed facts: the property is part of a large tract zoned as residential over two decades ago; the Buckles purchased their property over twenty years ago when it was zoned for residential use; and the Buckles actually used the property for residential purposes for years. In addition, the property was never used for commercial purposes. The 1995 designation of the property as Rural Neighborhood (for limited commercial purposes) was never a final zoning decision; the property was zoned for, but never used for, commercial purposes for less than a year before that zoning was invalidated as the product of last-minute lobbying by the Buckles and as a violation of the Growth Management Act's public participation requirement. Reliance on a void zoning designation is illusory.

Finally, the County's zoning of the Buckles' property was part of the adoption of a Comprehensive Plan mandated by state law. The county was required to adopt a plan designating urban growth areas, drawing a line between areas where urban growth was to be encouraged and areas where such growth would be prohibited. This policy choice included continuation of the rural residential designation not only for the Buckles' property but for the vast surrounding acreage which also was residential in character. The small neighborhood business area was retained but not expanded.

 The circumstances of this case are unlike those considered by the Supreme Court in its most recent takings case, *City of Monterey v. Del Monte Dunes at Monterey, Ltd.,* —— U.S. ——, 119 S.Ct. 1624, 1633, 143 L.Ed.2d 882 (1999). There the city repeatedly refused to abide by its own zoning ordinances and policies in rejecting Del Monte Dunes' nineteen different site plans in five separate decisions over a five-year period. The Del Monte Dunes property, which previously had been used for commercial purposes, was zoned for multi-family dwellings. Del Monte Dunes sought approval for development in conformance with Monterey's zoning requirements. In each of the five formal reviews, the city imposed more rigorous demands, ultimately denying the application. We decline to follow the Buckles' narrow characterization of events pertaining to their property's zoning, but instead, as the Supreme Court did in *Del Monte Dunes,* view their takings claim "in light of the context and ... history" of the land use decisions related to their property. *Id.* at 1644.

 The Buckles' claim that the zoning restricting use of their property to residential use "takes" their property without just compensation falls under the regulatory takings doctrine: "The general rule at least is that while property may be regulated to a certain extent, if regulation

**11.** Although the Buckles label their claim "spot zoning," it is generally referred to as "reverse spot zoning" when a zoning change imposes greater restrictions on property, resulting in economic detriment to the reclassified property owner. *See generally* Daniel R. Mandelker, Land Use Law 246 (4th ed.1997). No published Washington case specifically discusses a claim of reverse spot zoning, and the Buckles cite to various cases from other states for examples of illegal reverse spot zoning. *See, e.g., Ross v. City of Yorba Linda,* 1 Cal.App.4th 954, 2 Cal.Rptr.2d 638 (1991) (illegal spot zone where 1.17 acre lot was zoned to allow only one house per acre, and property at issue was "virtually surrounded by parcels of lesser size") (internal quotation marks omitted). These cases are inapposite because they do not involve the circumstances present here. Rather, they involve plaintiffs who purchased property under zoning that allowed for expansive use and the government subsequently rezoned the property to prohibit uses that were economically beneficial to the owners.

*goes too far* it will be recognized as a taking." *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S.Ct. 158, 67 L.Ed. 322 (1922) (emphasis added). Although the Supreme Court has not precisely delineated the elements of a regulatory takings claim, the contours have been established: a land use regulation does not constitute a taking if the regulation does not deny a landowner all economically viable use of the property and if the regulation substantially advances a legitimate government interest. *Nollan v. California Coastal Comm'n*, 483 U.S. 825, 834, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987) (citing *Agins v. Tiburon*, 447 U.S. 255, 260, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980)); *see also Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1015–16, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992).

■■■ The Buckles concede that the redesignation of their property as residential did not destroy all economically viable use of their property,[12] and they do not argue that the redesignation interfered with any investment-backed expectations.[13] Therefore, the Buckles' takings claim turns on whether the designation of "Rural Residential" use for their property substantially advances a legitimate state interest. The Buckles contend that this question should be decided by a jury.

■■■ The district court, following the not uncommon practice in takings cases prior to *Del Monte Dunes*, found there were no disputed facts and ruled on the takings claim as a matter properly decided on summary judgment. *Del Monte Dunes* requires a re-evaluation of whether summary judgment was the correct procedure. The Supreme Court addressed the allocation of liability determinations between judge and jury in regulatory takings cases and held that a property owner asserting a takings claim in an action under 42 U.S.C. § 1983 has a Seventh Amendment right,

albeit not unlimited, to a jury trial. *See* 119 S.Ct. at 1644.

■■■ Under *Del Monte Dunes*, a plaintiff clearly has the right to a jury trial on the "predominantly factual question" of "whether a landowner has been deprived of all economically viable use of his property." *See id.* This point is not dispositive, however, because although the Buckles argue diminution in value due to residential zoning, they do not seriously contend deprivation of all economically viable use.

On the "more difficult question" of who decides whether a land use decision substantially advances a legitimate government interest, in *Del Monte Dunes* the Supreme Court noted that "[a]lthough our cases make clear that this inquiry involves an essential factual component, it no doubt has a legal aspect as well, and is probably best understood as a mixed question of fact and law." *Id.* (internal citation omitted). Under the circumstances present in *Del Monte Dunes*, the Supreme Court approved of "the narrow question submitted to the jury[:] whether, when viewed in light of the context and protracted history of the development application process, the city's decision to reject a particular development plan bore a reasonable relationship to its proffered justifications." *Id.* at 1644. The Court viewed the mixed question of law and fact at issue in *Del Monte Dunes* as "essentially fact-bound." *Id.* (internal quotation marks omitted).

The Supreme Court emphasized, however, that its holding does not establish a right to a jury on every takings claim, explicitly stating that "we do not attempt a precise demarcation of the respective provinces of judge and jury in determining whether a zoning decision substantially advances legitimate government interests." *Id.* As examples, the Supreme Court noted

---

**12.** The Buckles own expert valued the residential property at $421,000, more than three times the purchase price.

**13.** Within the category of denial of economic use, the courts often consider whether the

regulation interfered with the landowner's investment-backed expectations. *See Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978).

that "our holding does not extend to" challenging "the constitutionality of the city's general land-use ordinances or policies," nor to a challenge that "the city's general regulations were unreasonable as applied to [a landowner's] property." *Id.* at 1645. In *Del Monte Dunes,* by contrast, it was appropriate for a jury to determine whether the regulation substantially advanced a legitimate interest because

> to the extent Del Monte Dunes' challenge was premised on unreasonable governmental action, the theory argued and tried to the jury was that the city's denial of the final development permit was inconsistent not only with the city's general ordinances and policies but even with the shifting ad hoc restrictions previously imposed by the city. Del Monte Dunes' argument, in short, was not that the city had followed its zoning ordinances and policies but rather that it had not done so.

*Id.*

Frankly, we have some difficulty parsing the distinctions laid out by the Supreme Court concerning when a jury trial is required. We find ourselves in uncharted territory with a map for related but different waters. Indeed the acknowledgment that no "precise demarcation" is established and the recognition that in some cases the determination of whether the state's purposes were legitimate "might well fall within the province of the judge," leaves us with the difficult task of determining where in that gap the Buckles' claims fall. The Court candidly notes "the limitation of [its] Seventh Amendment holding" and cautions that the unusual "posture of the case" counsels against a rule for all time. With these admonitions in mind and recognizing that the facts and procedural posture in *Del Monte Dunes* were extreme, we conclude that the district court did not err in deciding the takings claim on summary judgment.

First, the Buckles' theory is sufficiently different from that argued by Del Monte Dunes to distinguish the cases. Unlike Del Monte Dunes, the Buckles' challenge is not that King County's zoning of their property was inconsistent with their general ordinances and policies, but rather that it was inconsistent with the zoning on property surrounding the Buckles' property-in essence, the spot zoning claim. To the extent such a claim is characterized as an argument that the "general regulations were unreasonable as applied" to the Buckles, *Del Monte Dunes* did not address this issue. And, unlike *Del Monte Dunes,* the Buckles do not claim that King County failed to follow their zoning ordinances, but rather that it was unfair that the county chose to leave intact the established demarcation of residential versus commercial and not to expand the commercial zone by adding the Buckles' property.

Second, under the Buckles' theory, *Del Monte Dunes* would swallow long-standing summary judgment principles and always require a jury trial to determine whether the government's interests were legitimate and substantial. But *Del Monte Dunes* did not alter or even consider the traditional summary judgment standards. The *Del Monte Dunes* case was full of five years of factual disputes that went to the jury on jury instructions that were not even challenged by the city. The circumstances here are vastly different. Although identifying the alleged taking is not easy because the Buckles advance a number of variations on a single theory, two consistent arguments emerge: (1) that King County took the Buckles' property when it was redesignated as Rural Residential rather than Rural Neighborhood; and (2) the zoning is an illegal spot zone. As to the first argument, the county cannot "take" what the Buckles did not have. The zoning designation for limited business uses was never final and the Buckles ended up exactly where they started-residential use. The map of the Buckles' property and the surrounding area belies the validity of the second theory. As the district court held, there is no genuine issue of material fact. The zoning restrictions on property surrounding the Buckles' property is undisputed, as is the existence

of commercial zoning and non-conforming uses on surrounding property. Assuming everything the Buckles allege to be true and relying on the map of the property and the surrounding property, King County did not single out the Buckles' property for an incompatible use.

Finally, we note that the Buckles' § 1983 claim was not a takings claim, as in *Del Monte Dunes*, but rather a due process claim which was properly dismissed. The takings claim was asserted as a stand alone claim, not as a claim that "the government had denied a constitutional right in acting outside the bounds of its authority...." *Id.* at 1644.

The net result of the distinctions between *Del Monte Dunes* and this case is that it was within the province of the district court to determine whether the county advanced a substantial interest.

■ Evaluating the Buckles' takings claim on the merits then, King County asserted at least four interests in designating the Buckles' property as residential: (1) complying with the Growth Management Act's limitation on urban development outside of the urban growth boundary because the Buckles' property lies outside of King County's urban growth boundary; (2) maintaining consistency with the residential use zoning designation for the majority of property surrounding the Buckles' property; (3) not bowing the presence of non-conforming uses in the vicinity of the Buckles' property to justify additional commercial zoning; and (4) not expanding the nearby Rural Neighborhood to include the Buckles' property because of the presence of a salmon-bearing stream traversing the property.

■ The Supreme Court has made clear that the government has a legitimate interest in protecting undeveloped areas from "the ill effects of urbanization." *Agins,* 447 U.S. at 261, 100 S.Ct. 2138; *see also Village of Euclid v. Ambler Realty Co.,* 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926) (legitimate government interest in zoning certain areas for residential use

only). *Agins* involved a takings claim brought by a property owner who purchased five acres of unimproved land with views of San Francisco Bay for the purpose of residential development before the City of Tiburon enacted a single-family zoning ordinance that restricted building on the property to five single-family residences. The Supreme Court rejected the takings claim because the zoning ordinance did not deny the owner all economic use of the property and "serv[ed] the city's interest in assuring careful and orderly development of residential property with provision for open-space areas." *Id.* at 262, 100 S.Ct. 2138.

The Buckles argue that the facts of their case are closer to *Nectow v. City of Cambridge,* 277 U.S. 183, 48 S.Ct. 447, 72 L.Ed. 842 (1928), than *Agins. Nectow* involved a zoning restriction limiting commercial use of property within a city, on property surrounded on two sides by industrial use, 277 U.S. at 186, 48 S.Ct. 447, whereas in this case, the zoning at issue regulates a huge non-urban area and the overwhelming majority of the land surrounding the Buckles' property is zoned for residential use. *Nectow* recognized that courts should be reluctant to substitute their judgment for that of the zoning authority and set out the "substantial relation" test that is still in currency. Neither case is directly on point factually, but the facts of *Agins* are closer to the facts of this case than *Nectow,* and the Supreme Court's recognition in *Agins* of the legitimate government interest in limiting urbanization is dispositive.

■ Not every governmental attempt to restrict commercial development will be upheld as advancing the interest of protecting against urbanization, but the Buckles' claim that the government went "too far" in this case fails in light of the facts that the Buckles purchased the property when it was zoned for residential use, they actually used it for residential use for years, and it was zoned for commercial use for only a short period of time before that

zoning was invalidated. If the Buckles were to prevail in their argument that the government lacks a legitimate interest in drawing a line at existing commercial use in non-urban areas, King County correctly points out that "the whole of rural King County would eventually be zoned commercial."

AFFIRMED. Each party shall bear its own costs on appeal.