OPINION OF THE COURT
GARTH, Circuit Judge.
In this appeal, we consider whether the former members of the Pennsylvania Gaming Control Board are immune from suits brought against them in their individual capacities based on their decisions to grant gaming licenses to certain applicants other than appellee Keystone Redevelopment Partners, LLC (Keystone). We conclude that they are entitled to absolute, quasi-judicial immunity. Accordingly, we will reverse the decision of the District Court.
I.
In 2004, the Pennsylvania General Assembly enacted the Pennsylvania Race Horse and Gaming Act, 4 Pa. Cons.Stat. §§ 1101-1906, which created the Pennsylvania Gaming Control Board (“Gaming Board” or “Board”) to license a limited number of gaming entities within the Commonwealth. 4 Pa. Cons.Stat. §§ 1201, 1202. The Gaming Board is comprised of seven voting members,[1] three of whom are appointed by the Governor and four of whom are appointed by four different members of the General Assembly. Id. § 1201(b). The voting members serve fixed terms of office — three years for gubernatorial appointees, two years for legislative appointees — and may only be removed for “misconduct in office, willful neglect of duty or conduct evidencing unfitness for office or incompetence,” or a conviction for certain criminal offenses. Id. § 1201(b.l), (d). They are prohibited from political activity and from making or soliciting political contributions. Id. § 1202.1(c)(5).
The Gaming Board’s procedure for considering license applications is governed by express statutory and regulatory guidelines, which include the following:
• Before conducting a licensing hearing, the Board must hold at least one public input hearing at which witnesses may testify and the opportunity for public comment is afforded. Id. § 1205(b).
• A licensing hearing is held for each of the applicants. The Board must give notice of the hearing to the parties, 2 Pa. Cons.Stat. § 504, and make a schedule of the hearings available to the public, 58 Pa.Code § 441a.7(a).
• The Bureau of Investigations and Enforcement (BIE), an agency created by, but independent from, the Board, 4 Pa. Cons.Stat. § 1202(b)(25), performs background checks on each applicant and delivers a report to the Board “relating to the applicant’s suitability for licensure,” id. § 1517(a.l)(2).
• A member of the Board must “[disclose and recuse himself from any hearing or other proceeding in which the member’s objectivity, impartiality, integrity or independence of judgment may be reasonably questioned due to *92 the member’s relationship or association with a party connected to any hearing or proceeding or a person appearing before the board.” 4 Pa. Cons.Stat. § 1202.1(c)(3). In addition, no member may engage in ex parte communication regarding a pending matter. Id. § 1202.1(c.l). However, § 1202.1(e) defines “ex parte communication” to exclude “off-the-record communications by or between a member or hearing officer of the board ... prior to the beginning of the proceeding solely for the purpose of seeking clarification or correction to evidentiary materials intended for use in the proceedings,” as well as “communications between the board or a member and the office of chief counsel” of the BIE.
• At least thirty days before the initial license hearing, each applicant must file with the Board, and serve on all other applicants for the same license, “a memorandum identifying all evidence it intends to use in support of its presentation before the Board,” 58 Pa.Code § 441a.7(i), including any materials about which an expert witness will testify, id. § 441a.7(i)(4). Evidence that has not been identified in that manner may only be admitted later: 1) in response to a request from the Board, id. § 441a.7(m)(l); 2) “if the issue could not have been reasonably anticipated by the applicant,” id. § 441a.7(m)(2); or 3) to “present evidence which sets forth a comparison between the applicant and other applicants within the same category with respect to the standards and criteria” for receiving a license, id. § 441a.7 (n).
• At the licensing hearing,
• the applicant has a right to counsel, 2 Pa. Cons.Stat. § 502;
• the Board may subpoena documents and witnesses, 4 Pa. Cons.Stat. § 1202(b)(7);
• the applicant may present documentary and testimonial evidence, 58 Pa.Code § 441a.7(i);
• all witnesses must be sworn, id. at § 441a.7(q);
• the Board or Chief Enforcement Counsel, an agent of the BIE, may examine or question the applicant or applicant’s witnesses, id. § 441a.7(p); and
• the record must be transcribed, id. § 441a.7(v).
• Although there is no opportunity to cross-examine competitors’ witnesses, an applicant may raise objections to competitors’ hearings, id. § 441a.7(t), and, after filing notice with the Board and on the competitors, present evidence comparing its application to those of competitors, id. § 441a.7(n). In addition, after submitting their applications, applicants are given the opportunity to make final oral remarks before the Board, id. § 441a.7(w), and file a post-hearing brief addressing competitors’ applications for the license, id. § 441a.7(u).
• The Board must grant licenses to the applicants who best demonstrate, by clear and convincing evidence, their suitability for licensure based on certain enumerated factors, id. § 441a.7(d), which relate generally to: (a) the location and quality of the proposed facility; (b) the potential for economic development and new job creation, especially for Pennsylvania residents; (c) a plan for diversity in employment and contracting, (d) the history of the applicant in developing tourism facilities, meeting commitments to local agencies and community-based organizations, dealing with *93 its employees, and complying with the law; and (e) the degree to which potential adverse effects on the public resulting from the project will be mitigated. 4 Pa. Cons.Stat. § 1325(c).
• The Board must issue a final order and written decision, 58 Pa.Code § 441a.7(x), which contains factual findings and the reasons for the Board’s determination, 2 Pa. Cons. Stat. § 507. Unsuccessful applicants have the right to appeal to the Pennsylvania Supreme Court. 4 Pa. Cons. Stat. § 1204; 58 Pa.Code § 441a.7(y).
II.
In December 2005, appellee Keystone was one of five entities to apply for one of two Category 2 slot-machine licenses available for the City of Philadelphia. After holding public and licensing hearings for each applicant, at a December 20, 2006, public meeting, the Gaming Board unanimously voted to grant licenses to Fox-woods and to intervenor HSP Gaming, and to deny the other three entities’ applications, including Keystone’s. The Board detailed its factual findings and offered the reasons for its votes in a 113-page written decision.
In discussing one of the multiple factors weighing against Keystone’s application, the Board explained as follows:
The evidentiary record establishes that Keystone’s parent company, Trump Resorts, owns three Atlantic City casinos .... [Competitors] HSP/Sugarhouse, Riverwalk and Philadelphia Entertainment/Foxwoods do not own or control any Atlantic City properties. The Board has considered the fact of competing Atlantic City properties as a negative factor for licensure in Philadelphia. While the Board believes that each applicant desires to make a profit in Philadelphia if granted a license, the Board also is cognizant of its duty to license casinos in Philadelphia which are in the best interests of the Commonwealth and Philadelphia. The Board finds it credible that owners of casinos in both locations may attempt to use the Philadelphia property as a gambling-incubator to gain new customers who will then be lured to its Atlantic City properties where it can earn a much higher profit on every dollar gambled [due to the lower tax rate]. Likewise, the Board finds applicants without Atlantic City connections are more strongly motivated to compete directly against the Atlantic City competition because they have no interest in diverting patrons to the casino which has a better tax structure for the casino. Additionally, evidence has been introduced that the Tramp Entertainment properties in Atlantic City have undergone bankruptcy organizations in order to rebuild and revitalize them. The Board believes this further supports its decision to choose other applicants who do not have other facilities so close to Philadelphia which may lure patrons to Atlantic City to assist in the rebuilding and revitalization of properties there. Therefore, the Board finds that licensing casinos in Philadelphia which do not have common ownership with Atlantic City facilities are more likely to further the interests of the Commonwealth and the public which stands to benefit through increased revenues obtained by the Pennsylvania properties.
(App. 194-95.) Ultimately, while the Board found that each of the applicants was “eligible and suitable for licensure under the terms of the [Race Horse and Gaming] Act,” it concluded that Foxwoods and HSP Gaming “were the applicants which possessed the projects which the Board evaluated, in its discretion, to be the *94 best projects for licensure under the criteria of the Act.” (App. 101.)
Only one of the unsuccessful applicants, Riverwalk Casino, LP, exercised its statutory right to appeal to the Pennsylvania Supreme Court. The Court affirmed the order of the Gaming Board, holding, among other things, that the Board “serves as a quasi-judicial body with fact-finding and deliberative responsibilities.” Riverwalk Casino, LP v. Pa. Gaming Control Bd., 592 Pa. 505, 926 A.2d 926, 935 (2007).
On March 18, 2009, Keystone filed an amended complaint in the District Court for the Middle District of Pennsylvania against the members of the Gaming Board — those currently serving, in their official capacities, in addition to those serving on December 2006, in their individual capacities — seeking relief under 42 U.S.C. § 1983 for alleged violations of its constitutional rights under the Commerce Clause of Article I, Section 8, the First Amendment, and the Equal Protection Clause of the Fourteenth Amendment. Keystone asserted that the Gaming Board had reached its licensing determination based on an illegally discriminatory consideration, namely, that Keystone, due to its operation of gaming facilities in Atlantic City, might divert commerce to New Jersey rather than foster local economic interests. Keystone demanded relief in the form of declaratory, injunctive, and monetary relief and attorneys’ fees.
On March 27, 2009, the Gaming Board defendants and intervenor HSP Gaming moved to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6) on the basis that, inter alia, the Board members were entitled to quasi-judicial immunity (absolute immunity) or, in the alternative, qualified immunity. In a December 16, 2009, Memorandum and Order, the District Court dismissed Keystone’s claims against the current Gaming Board members on ripeness grounds, but denied the motions to dismiss with respect to Keystone’s claims against the former Board members.[2] Keystone Redev. Partners, LLC v. Decker, 674 F.Supp.2d 629, 668 (M.D.Pa.2009).
In first addressing the Board Defendants’ invocation of quasi-judicial immunity, the District Court declined to defer to the Pennsylvania Supreme Court’s determination in Riverwalk Casino that, based on state case law, the Gaming Board is a quasi-judicial body. Id. at 657. Instead, the District Court found that, based on the factual averments contained in Keystone’s complaint, the Board’s hearings, while akin to judicial proceedings in certain respects, appeared to lack some indicia of adversarial contests- — in particular, prohibitions on ex parte communications, opportunities for cross-examination, and the ability to challenge proffered evidence. Id. at 659. Therefore, the Court held that without development of an evidentiary record, it could not resolve the question of quasi-judicial immunity. Id.
Turning to the issue of qualified immunity, the Court concluded that Keystone, by alleging that the Board Defendants had deliberately favored local interests at the expense of out-of-state competitors, had sufficiently pled violations of “clearly established rights” protected under the Constitution’s Commerce Clause and the Equal Protection Clause for which relief could be granted. Id. at 660-67. Accordingly, the Court held that the Board Defendants were not entitled to qualified immunity, and denied their motions to dismiss Keystone’s complaint on those grounds. Id. at 667-68.
*95 The Board Defendants appealed to this Court for review of the District Court’s denial of their motion to dismiss on the basis of quasi-judicial and/or qualified immunity.
III.
We have jurisdiction over the order denying official immunity under the collateral order doctrine of 28 U.S.C. § 1291. Dotzel v. Ashbridge, 438 F.3d 320, 324 (3d Cir.2006) (citing Mitchell v. Forsyth, 472 U.S. 511, 526-27, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), among others).
When considering an appeal from a denial of a motion to dismiss, this Court exercises plenary review, accepting as true “[t]he facts alleged in the complaint and the reasonable inferences that can be drawn from those facts.” Farber v. City of Paterson, 440 F.3d 131, 134 (3d Cir.2006). In considering the propriety of the District Court’s ruling, this Court “may also consider matters of public record, orders, exhibits attached to the complaint and items appearing in the record of the case.” Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1384 n. 2 (3d Cir.1994).
A.
Quasi-judicial immunity attaches to public officials whose roles are ‘“functionally comparable’ to that of a judge.” Hamilton v. Leavy, 322 F.3d 776, 785 (3d Cir.2003) (quoting Butz v. Economou, 438 U.S. 478, 513, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978)). Such immunity “flows not from rank or title or location within the Government, but from the nature of the responsibilities of the individual official.” Cleavinger v. Saxner, 474 U.S. 193, 201, 106 S.Ct. 496, 88 L.Ed.2d 507 (1985) (citation and internal quotation marks omitted). Thus, in evaluating whether quasi-judicial immunity grants immunity to a particular official, a court inquires into “the official’s job function, as opposed to the particular act of which the plaintiff complains.” Dotzel, 438 F.3d at 325; Gallas v. Supreme Court of Pa., 211 F.3d 760, 769 (3d Cir.2000) (“[Ojur analysis must focus on the general nature of the challenged action, without inquiry into such ‘specifics’ as the [official’s] motive or the correctness of his or her decision.” (citing Mireles v. Waco, 502 U.S. 9, 13, 112 S.Ct. 286, 116 L.Ed.2d 9 (1991))).
In Cleavinger, the Supreme Court offered a non-exhaustive list of six factors “characteristic of the judicial process” that it had identified in Butz as relevant to a determination of whether an official enjoys quasi-judicial, and thus absolute, immunity:
(a) the need to assure that the individual can perform his functions without harassment or intimidation; (b) the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct; (e) insulation from political influence; (d) the importance of precedent; (e) the adversary nature of the process; and (f) the eorrectability of error on appeal.
474 U.S. at 202, 106 S.Ct. 496 (citing Butz, 438 U.S. at 512, 98 S.Ct. 2894). This Court has accordingly adopted the Butz factors outlined in Cleavinger as the touchstones of its quasi-judicial immunity inquiry. Dotzel, 438 F.3d at 325-27 (holding that members of a municipal board of supervisors were immune from suit brought against them in their official capacities).
Dotzel’s analysis, which is informed by the instructions of Butz and Cleavinger, as we are, has the same application to the Pennsylvania Gaming Control Board as it did to the Dotzel zoning officials. There can be no distinction among them when *96 applying the Butz factors.[3] We therefore analyze the quasi-judicial immunity question in this case by applying the Butz factors.
1. The need to assure that the function can be performed without harassment or intimidation
In Butz, the Supreme Court recognized that administrative law judges, like other judges, must be extended quasi-judicial immunity so that they “can perform their respective functions without harassment or intimidation” from dissatisfied parties, such as “an individual targeted by an administrative proceeding [who] will act angrily and may seek vengeance in the courts,” or a “corporation [that] will muster all of its financial and legal resources in an effort to prevent administrative sanctions.” 438 U.S. at 512, 515, 98 S.Ct. 2894. In Dotzel, we concluded that members of a municipal board of governors, as arbiters of local zoning disputes, would be subject to those same risks of harassment and intimidation. As we explained,
zoning disputes can be among the most fractious issues faced by municipalities, and the risk of threats and harassment is great. The monetary stakes are often quite high, especially in commercial cases like this one, making the possibility of liability an especially potent adversary of objectivity.... “[T]he public interest requires that persons serving on planning boards considering applications for development act with independence and without fear that, developers, who will frequently have significant financial resources and the ability to litigate, not bring them to court. The possibility of facing expensive litigation as a result of making a decision on an application for development may in a subtle way impact on the decision making process.”
438 F.3d at 325-26 (quoting Bass v. Attardi, 868 F.2d 45, 50 n. 11 (3d Cir.1989)).
Keystone argues that the Board Defendants are not subject to a significant risk of harassment and intimidation because they can only deprive applicants of financial opportunities, not liberty or property interests, and they can only award a limited number of licenses, which reduces the number of potentially vindictive, disappointed applicants. The Board Defendants, pointing to the four suits that have been brought against the Gaming Board arising from its December 2006 licensing decision, assert that gaming license applicants’ extensive financial resources make them more likely to initiate subsequent litigation to hold Board members liable for an adverse licensing ruling.
We conclude that this factor weighs in favor of immunity for the Board Defen *97 dants. The financial interests at stake are extremely large: all applicants must be able to afford a $50 million license fee, 4 Pa. Const. Ann. § 1209(a), and each of the December 2006 applicants had annual revenues in excess of $300 million. Keystone itself spent $10 million alone on its application, and in its presentation to the Gaming Board, it unveiled plans for a $444.8 million gaming project. After Keystone lost out on the license, it initiated three separate lawsuits, including this one. “ ‘When millions may turn on regulatory decisions [as in this case], there is a strong incentive to counter-attack.’ ” Butz, 438 U.S. at 515, 98 S.Ct. 2894 (quoting Expeditions Unlimited Aquatic Enters., Inc. v. Smithsonian Inst., 566 F.2d 289, 293 (D.C.Cir.1977)). It is plain that, much as in Dotzel, “the monetary stakes are ... high,” the applicants “have significant financial resources and the ability to litigate,” and thus “[t]he possibility of facing expensive litigation as a result of making a decision on an application ... may in a subtle way impact on the decision making process.” 438 F.3d at 825-26.
Our conclusion regarding this factor is buttressed by the reasoning of the District Court of Nevada, which, in holding that absolute immunity extended to members of the Nevada Gaming Control Board against claims arising from their licensing decisions, aptly described the unique concerns of retaliation facing members of a gaming licensing commission:
In this important area of public interest where the decisions made by these individuals often involve millions of dollars and the reputation of a whole state, there is a danger that a person who receives an adverse decision will retaliate and seek vengeance in the courts. The discretion and judgment of these officials in initiating administrative proceedings and in deciding matters of great public importance might be affected if their immunity from damages arising from those decisions was less than complete.
Kraft v. Jacka, 669 F.Supp. 333, 337 (D.Nev.1987) (quoting Rosenthal v. State of Nevada, 514 F.Supp. 907, 914 (D.Nev.1981)) (internal citations and quotation marks omitted). Those concerns are equally applicable to the Pennsylvania Gaming Control Board, and we are satisfied that the Board Defendants cannot exercise their judgment without fear of intimidation if their immunity from personal liability is not assured.
2. The presence of institutional safeguards against improper conduct
In fashioning the prevalence of the factors pronounced by Butz, the more the activity looks judicial, the more weight is to be given to officials’ freedom from personal liability.
In Butz, the Supreme Court opined that a finding of immunity for administrative judges was supported by the fact that “agency adjudication contain[s] many of the same safeguards as are available in the judicial process,” noting in particular that “[t]he proceedings are adversary in nature”; “they are conducted by a trier of fact insulated from political influence”; “[a] party is entitled to present his case by oral or documentary evidence”; “the transcript of testimony and exhibits together with the pleadings constitute the exclusive record for decision”; “[t]he parties are entitled to know the findings and conclusions on all of the issues of fact, law, or discretion presented on the record”; and the administrative judge “may issue subpoenas, rule on proffers of evidence, regulate the course of the hearing, and make or recommend decisions.” 438 U.S. at 513, 98 S.Ct. 2894. These safeguards were found to be present in Dotzel, just as they are relevant here. In particular, in Dotzel *98 there were requirements for (1) notice to the parties and the public, (2) public hearings, (3) specific procedures for conducting hearings, (4) the right to counsel, (5) the use of subpoenas and oaths, (6) the issuance of written decision, and (7) the preparation of transcripts. 438 F.3d at 326.
Here, consistent with Butz and Dotzel, the Gaming Board must (1) give notice to the parties, 2 Pa. Cons.Stat. § 504, and the public, 58 Pa.Code § 441a.7(a); (2) hold public-input hearings, 4 Pa. Cons.Stat. 1205(b); and (3) abide by specific procedures for conducting hearings, 58 Pa.Code § 441a.7; (4) the applicants are entitled to counsel, 2 Pa. Cons.Stat. § 502; (5) the Board may subpoena witnesses and documents, 4 Pa. Cons.Stat. § 1202(b)(7), and accept only sworn testimony, 58 Pa.Code § 441a.7(q); (6) the Board must issue a written decision, id. § 441a.7(x); and (7) the record must be transcribed, id. § 441a.7(v). This factor weighs in favor of immunity for the Board Defendants, just as it did for the public officials in Dotzel.
3. The degree of insulation from political influence
The Butz Court deemed probative to the question of immunity whether the process of adjudication at issue “is structured so as to assure that the hearing examiner exercises his independent judgment on the evidence before him, free from pressures by the parties or other officials within the agency.” 438 U.S. at 513, 98 S.Ct. 2894.
Voting members of the Gaming Board serve fixed terms, 4 Pa. Cons.Stat. § 1201(d); may only be removed for “misconduct in office, willful neglect of duty or conduct evidencing unfitness for office or incompetence,” or a criminal conviction, id. § 1201(b.l); are prohibited from political involvement, id. § 1202.1(c)(5); and must recuse themselves if their impartiality is called into question, id. § 1202.1(c)(3). Keystone points out that the ex officio members of the Gaming Board (the Pennsylvania Secretary of Revenue, Secretary of Agriculture, and Treasurer) are by definition not barred from political activity. The statutory scheme, however, mitigates any impropriety by denying those members — as distinct from the voting members — the ability to vote in licensing decisions. Id. § 1201(e). Accordingly, we conclude that the Board is adequately insulated from political pressures, thereby satisfying this element of quasi-judicial immunity.[4]
4. The use of precedent in resolving controversies
Although the Butz Court did not expound on the application of this factor, this Court in Dotzel inferred “the relevant question ... to be whether the Board’s decisions are purely discretionary, or are constrained by outside law.” 438 F.3d at 326-27. Since it was “not clear to what extent the Board refers to its own prior determinations in reaching decisions,” the Dotzel Court instead considered the fact that “the Board is required by statute to consider in its deliberations the land-use standards set out in the relevant zoning ordinance, and to explain its reasoning in written opinions,” as decisive of this factor. Id. at 327.
*99 The Board Defendants’ brief recognizes that the Board Defendants did not rely on past precedents because there was no past precedent — the December 2006 licensing decision represented the Board’s first written opinion on a license application. Because the licensing decision of the nascent Gaming Board was the first of its kind, we instead view as probative of this factor the existence of requirements that the record be transcribed, that the Board issue a written decision and final order, and that the Board employ “a cognizable burden of proof.” Cleavinger, 474 U.S. at 206, 106 S.Ct. 496.
Here, the Gaming Board is required by law to reach its decisions based on certain statutorily delineated criteria relating to each applicant’s eligibility and suitability for licensing. 4 Pa. Cons.Stat. Ann. §§ 1302-1305, 1325(c); 58 Pa.Code § 441a.7(e)-(h). As we have noted, in determining whether each applicant has satisfied those criteria, the Board is required to employ a “clear and convincing evidence” standard. 58 Pa.Code § 441a.7(d). As is evident in the Board’s written decision in this case, fulfillment of those criteria serves as a basis of comparison for deciding between the applicants. The Board also is mandated to issue a written decision accompanying its final order. We are satisfied that this factor also supports quasi-judicial immunity.
5. The adversarial nature of the process
The Butz Court recognized that certain facets of the adversarial process “enhance the reliability of information and the impartiality of the decisionmaking process”: (1) “[ajdvocates are restrained not only by their professional obligations, but by the knowledge that their assertions will be contested by their adversaries in open court,” (2) “jurors are carefully screened to remove all possibility of bias,” and (3) “witnesses are ... subject to the rigors of cross-examination and the penalty of perjury.” 438 U.S. at 512, 98 S.Ct. 2894. In Dotzel, which we read as applying here, we found that the proceedings at issue were “adversarial as a matter of law” because (1) “all interested parties [must] be given notice and an opportunity to attend,” (2) ex parte contacts were prohibited, (3) witnesses could be cross-examined, and (4) the parties could challenge proffered evidence. 438 F.3d at 327. The District Court here denied immunity to the Board Defendants because Keystone’s averments, which alleged that ex parte communication was permitted at the licensing hearings, among other averments, “cast substantial doubt as to the adversarial nature of the proceedings.” Keystone, 674 F.Supp.2d at 629.
We observe that in applying for a license to the Gaming Board, almost all of the adversarial elements this Court identified in Dotzel are met at Gaming Board licensing hearings. The applicants must be given “reasonable notice of a hearing and an opportunity to be heard,” 2 Pa. Cons.Stat. § 504; are entitled to object to rulings made by the Board in competitors’ hearings as well as their own, 58 Pa.Code § 441a.7(t); and may challenge competitors’ evidence and applications by presenting comparative evidence, briefs, and oral argument, id. § 441a.7(n), (u), (w). In addition, Gaming Board members are largely proscribed from ex parte communications, participation in which is usually grounds for recusal, 4 Pa. Cons.Stat. § 1202.1(c), (c.l), (c.2), although such communications are permitted 1) between the Board and certain executive officers to the extent necessary to clarify or correct evidentiary materials or 2) between the Board and the office of chief counsel of the BIE. Id. § 1202.1(e).
*100 Contrary to the District Court’s determination, those limited exceptions to the blanket ban on ex parte contacts do not affect the Board members’ eligibility for quasi-judicial immunity. See, e.g., Brokaw v. Mercer Cnty., 235 F.3d 1000, 1015-16 (7th Cir.2000); J.B. v. Wash. Cnty., 127 F.3d 919, 925-26 (10th Cir.1997).
Keystone also identifies two hallmarks of the adjudicatory process that are absent from licensing proceedings before the Gaming Board. First, Keystone claims that an applicant is not entitled to test the veracity of background information relating to each applicant, which the Board may consider in reaching its determination. 58 Pa.Code § 441a.7(r). That concern, however, is tempered by the requirements that the Board must give notice of the contents of any non-confidential information, 4 Pa. Const. Stat. § 1206(g); “[t]he Board may request that an applicant respond to inquiries related to confidential information during a licensing hearing to promote transparency in the regulation of gaming in this Commonwealth,” 58 Pa.Code § 441a.7(r); and the applicant may object to any ruling by the Board, id. § 441a.7(t).
It is undisputed that applicants here have no right to cross-examination. Some courts have concluded that while the absence of a right to cross-examination may support a finding that a given proceeding is non-adversarial, see Cleavinger, 474 U.S. at 206, 106 S.Ct. 496, this does not determine the issue. In considering the requirement for permitting cross-examination in order to immunize officials under the quasi-judicial status asserted here by the Board Defendants, our sister circuits have held that the other factors of weighing evidence, issuing written decisions, administering oaths, and the like, are sufficient. See Beck v. Tex. State Bd. of Dental Exam’rs, 204 F.3d 629, 636 (5th Cir.2000) (holding that state dental board disciplinary proceedings were adversarial, thus supporting finding of quasi-judicial immunity for board members, because dentist had rights to present evidence and to counsel, and board administered oaths to witnesses and made evidentiary rulings); Dunham v. Wadley, 195 F.3d 1007, 1011 (8th Cir.1999) (concluding that members of veterinary licensing board were entitled to immunity, without mentioning whether right of cross-examination existed at licensing hearings, because “board weighed evidence, made factual determinations, determined sanctions, and issued written decisions”); see also Franklin v. Shields, 569 F.2d 784, 796, 798 (4th Cir.1977) (deciding pre-Butz that members of parole board were entitled to quasi-judicial immunity even though prisoners did not have rights to call or cross-examine witnesses at parole hearings).
Moreover, not every Butz factor must be satisfied for an official to be entitled to quasi-judicial, absolute immunity. Miller v. Davis, 521 F.3d 1142, 1145 (9th Cir.2008); Beck, 204 F.3d at 635 (noting that when analyzing Butz factors, “[n]o one factor is controlling”). It follows that the District Court erred by denying the Board members immunity on the basis of considerations related to the adversariness factor alone. See Keystone, 674 F.Supp.2d at 659,
6. The availability of appellate review
In Dotzel, this Court recognized that “[a] formal appellate procedure is probably the single most court-like feature a government body can have,” explaining that many of the procedural safeguards integral to the quasi-judicial immunity analysis “exist largely to facilitate appellate review,” and noting that “it is a hallmark of courts, unlike legislature and executives, that (with one exception) they do not con *101 sider themselves to be either final or infallible.” 438 F.3d at 327. We agree.
Under 4 Pa. Cons.Stat. Ann. § 1204, unsuccessful gaming license applicants may appeal as of right to the Pennsylvania Supreme Court; that Court, in turn, “shall affirm all final orders, determinations or decisions of the board ... unless it shall find that the board committed an error of law or that the order determination or decision of the board was arbitrary and there was capricious disregard of the evidence.” To facilitate any appeal, the Board must transcribe the hearings, 58 Pa.Code § 441a.7(v), and issue a written decision, id. § 441a.7(x). It is clear that Keystone had a right to appeal the Gaming Board’s decision to the Pennsylvania Supreme Court, which it chose not to exercise. Therefore, as the District Court similarly concluded, Keystone, 674 F.Supp.2d at 659, this factor also supports immunity for the Board Defendants.[5]
In sum, we hold that the Butz factors, on balance, clearly support quasi-judicial immunity for members of the Pennsylvania Gaming Control Board.
B.
Finally, we disagree with the District Court’s conclusion that additional factual development is necessary. As we acknowledged in Dotzel, deciding whether to extend quasi-judicial immunity to an official involves a “legal determination” that focuses on “the legal and structural components of the job function, as opposed to detailed facts about specific acts and mental states.” 438 F.3d at 325. Here, as in Dotzel, it is evident that, based on the relevant statutory and regulatory provisions governing Gaming Board hearings, the Board serves a quasi-judicial function, which entitles a Board member to “immunity from suit rather than a mere defense to liability.” Mitchell, 472 U.S. at 526, 105 S.Ct. 2806.
We conclude that an overall consideration and weighing of the factors required by Butz to establish quasi-judicial, absolute immunity for the licensing decisions of the Board' Defendants have been more than met. In light of our conclusion, we need not reach or address the parties’ arguments concerning qualified immunity.
rv.
We will reverse the decision of the District Court and direct that the District Court on remand enter an order dismissing all counts against the Board Defendants.

. Three ex officio members — the Secretary of Revenue, Secretary of Agriculture, and the State Treasurer — also sit on the Board, but are not permitted to vote. Id. § 1201(e).

. Throughout this opinion, for ease of reference, we collectively refer to the members of the former Board and intervenor HSP Gaming as "Board Defendants.”

. The distinction that Judge Fisher, our dissenting colleague, draws between adjudicating rights and adjudicating privileges is untenable for two reasons.
First, the zoning board in Dotzel was sued for its decision to deny a conditional-use permit, which, if granted, confers on the grantee a license, not a right, to use her land in a particular fashion. The denial of that license in Dotzel, a determination that we believed warranted quasi-judicial immunity, is no different from the denial of a license to operate slot machines that gives rise to this case.
Second, federal courts have uniformly concluded that state licensing bodies charged with deciding whether to award discretionary licenses are entitled to quasi-judicial immunity. Burnett v. McNabb, 565 F.2d 398, 400 (8th Cir.1977) (County Beer Board granting conditional beer license); Kraft v. Jacka, 669 F.Supp. 333, 337 (D.Nev.1987) (State Gaming Commission denying gaming license); Hamm v. Yeatts, 479 F.Supp. 267, 271-72 (W.D.Va.1979) (State Alcoholic Beverage Commission denying beer license); Brown v. DeBruhl, 468 F.Supp. 513, 519 (D.S.C.1979) (State Alcohol Beverage Control Commission denying liquor license).

. Judge Fisher, our dissenting colleague, suggests that even though the Board members serve for a set term of years, they are still subject to political pressure to decide licensing applications in a particular way if they wish to ensure their reappointment. That line of reasoning would similarly deny elected state judges absolute immunity, a proposition that we cannot, and do not, endorse. See Tobin for Governor v. Ill. State Bd. of Elections, 268 F.3d 517, 526 (7th Cir.2001); Brown v. Griesenauer, 970 F.2d 431, 439 (8th Cir.1992).

. In Riverwalk Casino, LP v. Pa. Gaming Control Bd., 592 Pa. 505, 926 A.2d 926, 935 (2007), the Supreme Court of Pennsylvania held, as we have noted earlier, that the Pennsylvania Gaming Control Board (the Board Defendants here) is a quasi-judicial body. Therefore, under the authority of Butz, 438 U.S. 478, 98 S.Ct. 2894 the members of that body would be entitled to absolute immunity from personal liability.