**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 25-1820
_____

GUIDO BUSSINELLI; SCOTT CHERVEN; KEVIN HEBERT,
Appellants

v.

TOWNSHIP OF MAHWAH; JAMES WYSOCKI, individually and in his
official capacity; WARD DONIGAN, individually and in his official
capacity; DAVID MAY, individually and in his official capacity; ROBERT
M. FERGUSON, III; JANET ARIEMMA, individually and in her official
capacity; KIM BOLAN, individually and in her official capacity;
MICHELLE CROWE PAZ, individually and in her official capacity;
JONATHAN S. WONG, individually and in her official capacity; BEN
KEZMARSKY, individually and in his official capacity; JOHN DOES (1-
10); XZY CORP., INC.; JANE DOES (1-10)
_____

On Appeal from the United States District Court
for District of New Jersey
(D.C. Civil No. 2:23-cv-21519)
District Judge: Hon. Jamel K. Semper
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
February 3, 2026

Before: HARDIMAN, MONTGOMERY-REEVES, and ROTH, *Circuit Judges.*

(Opinion filed: March 11, 2026)

_____

OPINION*
_____

MONTGOMERY-REEVES, *Circuit Judge*.

In this action, three police officers in Mahwah, New Jersey claim that the promotion of another officer to Chief of Police violated their rights under the federal and New Jersey constitutions. The District Court dismissed the officers' claims, and we will affirm the District Court's judgment.

## I.    BACKGROUND[1]

Guido Bussinelli, Scott Cherven, and Kevin Hebert (collectively, the "Appellants") are veterans of the Mahwah Police Department (the "Department"), each with over 23 years of experience on the force. Each man joined as a patrol officer and was promoted repeatedly. By the time they filed their Amended Complaint (the "Complaint"), the Appellants had attained senior positions in the Department: Bussinelli was Executive Officer, while Cherven and Hebert were Captains.

The Appellants served with the Township of Mahwah's (the "Township") mayor, Appellee James Wysocki, who, before entering politics, was a patrol officer for about 25 years. As an officer, "Wysocki had a strained relationship with then Chief of Police James

---

* This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

[1] We recite the following facts from the Complaint, which, for purposes of this appeal, we accept as true. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Batelli" and believed the Appellants were "personally and politically associated" with Batelli. Appendix (hereinafter "App. __") 52. Wysocki considered the Appellants and another officer, then-Captain Stephen Jaffe, "Batelli's boys." App. 52–53.

Over the years, several incidents led Wysocki to dislike Batelli and his "boys." In 2009, for example, Cherven gave Wysocki a performance improvement plan; Wysocki believed that he was targeted because Batelli did not like him. Matters became worse when "all three [Appellants] arrested a close friend of . . . Wysocki for DWI," after which Wysocki remarked, "It's [a–]holes like you guys who ruin it for the rest of us." App. 53. When the Appellants rearrested the same person for another DWI, Wysocki complained that the Appellants "should not be doing everything Chief Batelli advised them to do." App. 54. Over time, the Appellants arrested at least three more people whom Wysocki favored, and Wysocki "repeatedly commented that [the Appellants] should not look to associate themselves and be so close with Chief Batelli." *Id.* These and other run-ins with Wysocki and those close to him allegedly fueled Wysocki's disdain for the Appellants as "Batelli's boys."

Wysocki retired from the Department in 2010, and in 2016 ran for a seat on Mahwah's Township Council (the "Council"). At one point during Wysocki's campaign, Cherven advised Wysocki to remove his car from Township property because it contained a campaign sign, causing Wysocki to claim that Cherven opposed him because Cherven was associated with Batelli. During the campaign, the "[Appellants] openly discussed at work and off duty that . . . Wysocki was only running for [the] Council in an effort to torment then Chief Batelli." App. 55. Wysocki won his Council bid and took office in

3

2017.  Batelli retired in 2019, and the then-mayor appointed Jaffe Chief of Police, over Wysocki's objection.

In 2020, Wysocki ran for mayor and won.  During the campaign, the Appellants reprised their conversations from four years earlier; they "openly discussed at work and off duty that . . . Wysocki was only running for Mayor in an effort to torment Jaffe and the rest of 'Batelli's boys.'"  App. 57–58.  After Wysocki was sworn in, the Appellants "openly discussed . . . Wysocki's treatment of the [Department], and in particular 'Batelli's boys,' at work and off duty."  App. 58.  As mayor, the Appellants allege, Wysocki slighted those whom he considered "Batelli's boys" and treated other officers more respectfully.

In 2023, Jaffe retired.  In a letter to Appellee Ben Kezmarsky, the Township's Business Administrator, Jaffe recommended Bussinelli and Cherven for Chief of Police.  Wysocki posted the job publicly, and the Appellants applied, sending résumés, letters of interest, and their goals for the Department.  On June 6 and June 7, 2023, the Appellants interviewed with Wysocki and Kezmarsky.  The Appellants expected, "[b]ased on the selection process for Chief Jaffe," a second round of interviews with some members of the Council.  But no such second round occurred.  Instead, on June 9, Wysocki chose to promote Lieutenant Timothy O'Hara, who had served for two years in that role and had "no prior administrative experience in the Department."  App. 63.  The Appellants allege the process that led to O'Hara's selection was "a sham."  App. 61.

For example, on June 12, Bussinelli asked Wysocki whether he "passed over two captains and the highest-ranking Lieutenant based" solely on a single interview.  App. 65.  Wysocki responded affirmatively.  The same day, Jaffe "warned . . . Kezmarsky about a

4

potential lawsuit," and Kezmarsky responded that the Township would pay for a defense because O'Hara was "who the mayor wanted." App. 66. On June 14, an officer named Travis Canning told Bussinelli that Wysocki had asked him the previous month whether O'Hara or another lieutenant—but no one else—would do well as Chief of Police. The next day, the same officer repeated the message to Cherven, adding that Wysocki did not ask about Bussinelli or Cherven "because they were 'Batelli's boys.'" App. 67.

On June 15, Wysocki and Kezmarsky advised Bussinelli and Cherven that O'Hara was chosen solely based on his interview, which "blew [Wysocki] away," and not other factors like "command duties, administrative functions, time in rank, merit, seniority, disciplinary action, [or] use of sick time." *Id.* Kezmarsky, meanwhile, averred that "there was no scoring system employed in the selection process and that the selection was subjective." *Id.* Separately, at some unspecified time "Wysocki admitted" to Kezmarsky and Appellee Ward Donigian, a Township councilmember, "that [Wysocki] pre-determined" the selection of O'Hara or another Lieutenant "due to [the] Appellants' personal and political associations with Chiefs Batelli and Jaffe." App. 62.

When the Township's mayor selects a Chief of Police, the Council votes on his confirmation. On June 19, the Council met to vote on O'Hara's promotion. That day, Appellee David May, a Township councilmember, advised his fellow councilmembers to approve O'Hara's promotion "because 'it would look better' if the Council voted unanimously." App. 68. The Council later confirmed O'Hara unanimously.

After the vote, Donigian temporarily left the Council's meeting to tell Bussinelli that he was "Batelli's collateral damage" and that "O'Hara's promotion to Chief of Police

5

was 'bulls[–].'" App. 69.  Donigian advised Bussinelli that Wysocki had "refused" to "produce all of the resumes and proposals" submitted by applicants for Chief of Police. App. 70.  Donigian also told Bussinelli that another Township councilmember, Appellee Janet Ariemma, "wanted to vote" for Bussinelli "but was hesitant because [Bussinelli] had previously arrested Ariemma's son." *Id.*

Following these events, the Appellants sued the Township, Wysocki, Kezmarsky, the Township councilmembers, and several anonymous entities through a four-count Complaint.  Count I alleges retaliation for expression protected by the First Amendment.  Count II alleges that the Appellees violated the Appellants' Fourteenth Amendment right to substantive due process by damaging their reputations and impairing their alleged property interest in "their employment with the [Department]."  App. 76.  Count III asserts a claim for violation of New Jersey's Civil Rights Act (the "NJCRA").  And Count IV alleges the Appellees engaged in a conspiracy to deprive them of their civil rights under 42 U.S.C. § 1985.  The District Court dismissed the Complaint in full, precipitating this appeal.

## II.    DISCUSSION[2]

The Appellants contest the dismissal of each count.  We address each count, and their constituent allegations, in turn.

### A.    First Amendment—Retaliation

In essence, the Appellants' First Amendment claim is that Wysocki did not promote them to Chief of Police, and the Council confirmed O'Hara, in retaliation for conduct protected by the First Amendment's Free Speech Clause.  *See* U.S. CONST. amend. I. According to the Appellants, their protected conduct took multiple forms.  First, they engaged in "protected associational activity with Chief Batelli."  App. 74.  Second, they "engaged in protected speech about [Wysocki's] political candidacy and aspirations." App. 73.  Third, the Appellants claim they "engaged in protected speech . . . about . . . Wysocki's sham interview process before the Council officially selected Lt. O'Hara."  App. 73–74. None of this alleged speech or associational activity supports a First Amendment retaliation claim.

To plead such a claim, public employees like the Appellants "must allege '(1) that the activity in question is protected by the First Amendment, and (2) that the protected activity was a substantial factor in the alleged retaliatory action.'"  *Fenico v. City of*

---

[2] The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1367(a). We have jurisdiction under 28 U.S.C. § 1291.  Our review of a District Court's decision of a motion to dismiss is de novo.  *Kalu v. Spaulding*, 113 F.4th 311, 324 (3d Cir. 2024).  "We accept as true the factual allegations in the complaint, and draw all reasonable inferences in the [Appellants'] favor."  *Phila. Taxi Ass'n v. Uber Techs., Inc.*, 886 F.3d 332, 338 (3d Cir. 2018); *Keystone Redevelopment Partners, LLC v. Decker*, 631 F.3d 89, 95 (3d Cir. 2011).

*Philadelphia*, 70 F.4th 151, 162 (3d Cir. 2013) (quoting *Hill v. Borough of Kutztown*, 455 F.3d 225, 241 (3d Cir. 2006)). Speech or association is protected when the speaker (1) "spoke [or associated] as a private citizen, and (2) the statement [or association] involved a matter of public concern." *Id.* As pleaded, neither the Appellants' alleged association with Batelli nor their speech was both protected by the First Amendment and a substantial factor in their non-promotion to Chief of Police.[3]

### 1. Association With Batelli

We begin with the Appellants' alleged association with Batelli.[4] Of the "[t]wo types of association [that] are protected by the federal Constitution," only one is relevant here: "expressive association," which is "association for the purpose of engaging in activities protected by the First Amendment." *Pi Lambda Phi Fraternity, Inc. v. Univ. of Pittsburgh*, 229 F.3d 435, 438 (3d Cir. 2000).[5] And only one of those activities—speech—is relevant

---

[3] The District Court rested the relevant portion of its decision only on the First-Amendment-protection issue. Nonetheless, we address the substantial-factor element below, where appropriate, because "we may affirm on any ground supported by the record." *In re Adams*, 151 F.4th 144, 149 (3d Cir. 2025) (citation and internal quotation marks omitted); *see also In re Google Inc. Cookie Placement Consumer Priv. Litig.*, 806 F.3d 125, 143 (3d Cir. 2015) ("whether the Appellants have stated a claim is a matter of law to be determined from the face of the[] complaint," even when an "issue was not addressed by the District Court").

[4] The Appellants' Opening Brief focuses primarily on their speech as the basis for their First Amendment claim. We nonetheless construe their discussion of "freedom of association," Opening Br. 16, to preserve arguments about their association with Batelli, since that alleged association is a critical pillar of their retaliation claim.

[5] The other form of protected association is "intimate association," which refers to "certain close and intimate human relationships like family relationships." *Pi Lambda Phi*, 229 F.3d at 438.

here.  *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 617–18 (1984) (identifying First Amendment-protected activities).

"'Speech' is not construed literally," and includes "some nonverbal acts of communication," like "expressive conduct" and "symbolic speech," in addition to "speaking and writing."  *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 158 (3d Cir. 2002).  But conduct amounts to speech only when its nature, context, and environment shows that it "was sufficiently imbued with elements of communication," like attitudes, messages, or beliefs.  *Id.* (quoting *Spence v. Washington,* 418 U.S. 405, 409 (1974)).  Thus, to plead a First Amendment retaliation claim based on their alleged association with Batelli, the Appellants must plausibly allege, as a threshold matter, that each appellee believed the Appellants associated with Batelli to relay attitudes, messages, or beliefs to someone.  *See Troster v. Pa. State Dep't of Corr.*, 65 F.3d 1086, 1091 (3d Cir. 1995) (rejecting expressive-conduct claim where conduct did not "relay any *message* (ideological or otherwise) to anyone"); *Salvation Army v. Dep't of Cmty. Affairs*, 919 F.2d 183, 199 (3d Cir. 1990) ("[T]here is no constitutional right to associate for a purpose that is not protected by the First Amendment."); *Heffernan v. City of Paterson*, 578 U.S. 266, 273 (2016) (holding that "the government's reason" for its action "is what counts" when assessing whether the action constitutes retaliation).

Here, there is no allegation that Wysocki believed the Appellants were associating with Batelli for protected purposes.  We accept, of course, that Wysocki believed the Appellants were "associated" with Batelli in a "personal[] and political[]" sense, and that Wysocki was on the wrong side of "a divide" between officers who liked Batelli and those

9

who felt alienated from him. App. 52. But the vague and unexplained reference to "personal[] and political[]" association does not imply that Wysocki thought the Appellants were associating with Batelli to convey attitudes, messages, or beliefs, political or otherwise. At most, it implies that Wysocki thought he was not included in the Appellants' interpersonal in-group. The Appellants thus have failed to plausibly plead that Wysocki's cognitive association of the Appellants with Batelli, and as "Batelli's boys," constitutes the expressive association necessary for a First Amendment retaliation claim.[6]

### 2. Speech About Wysocki's Political Candidacies

Appellants next allege that their non-promotion was payback for "protected speech about [Wysocki's] political candidacy and aspirations." App. 73. Because we view a complaint's factual allegations "in the light most favorable to the Appellants," we construe that claim broadly to refer to the Appellants' comments about both Wysocki's Township Council candidacy and his mayoral candidacy. *Newark Cab Ass'n v. City of Newark*, 901 F.3d 146, 151 (3d Cir. 2018).

The Appellants argue that they discussed "Wysocki's political ambitions" in their personal capacities and imply, by analogy to one of our non-precedential decisions, that such speech involved a matter of public concern. Opening Br. 18 (citing *Falco v. Zimmer*, 767 F. App'x 288 (3d Cir. 2019)). We need not address those arguments because the

---

[6] Even if Wysocki believed the Appellants were expressively associating with Batelli, Wysocki's belief would not enable a First Amendment retaliation claim against Kezmarsky or the councilmembers. The Complaint alleges no reason why *they* would have perceived the Appellants as associated with Batelli, and no reason why they would have wanted to promote O'Hara because of such association. *See Heffernan*, 578 U.S. at 273.

Complaint offers no reason to infer that the Appellants' speech about Wysocki's political ambitions "was a substantial factor in the alleged retaliatory action." *Fenico*, 70 F.4th at 162 (citation and internal quotation marks omitted).

Put simply, there is no reason to infer that Wysocki, or anyone else for that matter, knew about the Appellants' speech. "[F]or protected conduct to be a substantial or motiving factor in a decision, the decisionmakers must be aware of the protected conduct." *Ambrose v. Twp. of Robinson*, 303 F.3d 488, 493 (3d Cir. 2002). Although the Complaint alleges that the Appellants spoke, it says little about whom they spoke to, who heard them, or who might have been aware, even generally, that they were discussing Wysocki. Nor is there any other pleaded reason to believe that Wysocki or any other decisionmaker "had any knowledge of," or was in any way "aware of," what the Appellants were saying about Wysocki's political ambitions. *Gorum v. Sessoms*, 561 F.3d 179, 188 (3d Cir. 2009). Thus, their speech "could not possibly have been a substantial or motivating factor" in the decision not to promote the Appellants. *Ambrose*, 303 F.3d at 493.

### 3. Speech About the Interview Process

Appellants also allege retaliation based on their speech concerning "Wysocki's sham interview process," which occurred after Wysocki gave O'Hara the promotion but before the Council confirmed O'Hara as Chief. App. 73. Here the Appellants plead the recipients of their speech—"Wysocki, Kezmarsky, and others"—but do not specify the speech involved. *Id.*

Reading these allegations about time period and addressees in the light most favorable to the Appellants, we take the relevant speech to be: Bussinelli's June 12, 2023

11

conversation with Wysocki; Bussinelli's June 14 conversation with Canning; Cherven's June 15 conversation with Canning; and Bussinelli's and Cherven's June 15 discussion with Wysocki and Kezmarsky. The Appellants argue this speech was "protected" because "it disclosed public officials' misfeasance." Opening Br. 19. But protection is only half the story. And the Appellants again have failed to plead the other half; the interview-process speech has no plausible relationship to their non-promotion. That is fatal to this branch of their retaliation claim.

With respect to Wysocki, the reason is temporal. By the time Bussinelli and Cherven learned about Wysocki's allegedly deficient interview process and began speaking about it, Wysocki already had made his decision and tapped O'Hara for Chief. Wysocki could not have selected O'Hara instead of the Appellants—nor *predetermined* that O'Hara or another lieutenant would get the job, as the Appellants also claim—in retaliation for speech that had not yet occurred.[7]

Bussinelli's and Cherven's interview-related speech cannot support retaliation claims against the other Appellees, either. Here again, the Complaint fails to plead facts from which we could draw a plausible inference that the Township councilmembers knew about Bussinelli's or Cherven's speech. *See Ambrose*, 303 F.3d at 493; *Gorum*, 561 F.3d at 188. As for Kezmarsky, who participated in the June 15 conversation with Wysocki,

---

[7] To the extent that the Appellants claim they suffered retaliation because Bussinelli spoke with Donigian "[a]fter the Council selected" O'Hara, the same temporal problem dooms them. App. 74. Wysocki already had chosen O'Hara, and the Council had confirmed him, before Bussinelli and Donigian spoke. So O'Hara's selection and confirmation could not have been retaliation for Bussinelli's speech.

12

Bussinelli, and Cherven, the Appellants do not allege that Kezmarsky later did anything we could construe as retaliatory. So even if Bussinelli's and Cherven's speech was protected, it could not ground a First Amendment claim. *See, e.g.*, *Fenico*, 70 F.4th at 162.

\* \* \*

Because the Appellants have not alleged any activity that plausibly was protected by the First Amendment and could have motivated the Appellees not to promote them, they have failed to plead one of the two necessary conditions for a First Amendment retaliation claim.[8] We will therefore affirm the District Court's dismissal of that claim.

## B. Fourteenth Amendment—Substantive Due Process

The Appellants claim that the Appellees violated their Fourteenth Amendment guarantee of substantive due process by "stigmatiz[ing] [them] as 'Batelli's boys'" and conducting or abetting "an arbitrary and abusive sham interview process," which caused reputational harm and damaged their "future career prospects." App. 76–77. But the facts here do not support a substantive-due-process claim.

It is axiomatic that "reputation *alone* is not an interest protected by the Due Process Clause." *Dee v. Borough of Dunmore*, 549 F.3d 225, 233 (3d Cir. 2008) (citation and internal quotation marks omitted). Thus, "to make out a due process claim for deprivation

---

[8] Consequently, we need not determine whether the Appellants plausibly could survive so-called *Pickering* balancing. *See generally Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). That exercise would have us weigh "the interests of the employee, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Munroe v. Cent. Bucks Sch. Dist.*, 805 F.3d 454, 466 (3d Cir. 2015) (cleaned up).

13

of a liberty interest in reputation, a plaintiff must show a stigma to his reputation *plus* deprivation of some additional right or interest" protected by state law or the Constitution. *Id.* at 233–34 (quoting *Hill*, 549 F.3d at 236); *see Clark v. Twp. of Falls*, 890 F.2d 611, 619 (3d Cir. 1989) ("[D]efamation is actionable under 42 U.S.C. § 1983 only if it occurs in the course of or is accompanied by a change or extinguishment of a right or status guaranteed by state law or the Constitution."); *see Paul v. Davis*, 424 U.S. 693, 711–12 (1976). We agree with the District Court that the Appellants have not plausibly pleaded either prong.

First, the Complaint does not allege that any appellee "creat[ed] and disseminat[ed] . . . a false and defamatory impression" about them. *Hill*, 455 F.3d at 236. Wysocki might have associated the Appellants with Batelli, but Wysocki's cognitive association is not dissemination. There is no allegation that Wysocki spread the word that the Appellants were "Batelli's boys," and even if he did, the label would not plausibly have injured the Appellants' reputations "or subject[ed] [them] to a loss of the good will and confidence in which [they were] held by others." *Decker v. Princeton Packet, Inc.*, 561 A.2d 1122, 1126 (N.J. 1989) (internal quotation marks omitted) (describing defamatory statements). Nor, in any event, does Wysocki's belief about the Appellants support Fourteenth Amendment claims against the other Appellees.

Second, even if the Appellants adequately pleaded stigmatic harm, they alleged no deprivation of a protected right or interest stemming from their non-promotion. Protected rights and interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law," regulation, or a public contract. *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972); *Dee*, 549 F.3d at 234

14

(finding a "constitutionally protected property interest" in "state statutory law" and a collective bargaining agreement). The Appellants argue that "they were denied the same fair and thorough selection process as had been done for the selection of Chief Jaffe," Opening Br. 21, but point to no statute, regulation, contract, or "mutually explicit understanding[]" that might have entitled them to the process they wanted.[9] *Stana v. Sch. Dist. of City of Pittsburgh*, 775 F.2d 122, 126 (3d Cir. 1985) (quoting *Perry v. Sindermann*, 408 U.S. 593, 601 (1972)). Nor do the Appellants point to any similar source that might give them a "legitimate claim of entitlement," *Roth*, 408 U.S. at 577, to unimpaired "future career prospects," App. 76. We thus agree with the District Court that the Appellants failed to plead a substantive-due-process claim.

## C. The NJCRA

Relying on the same allegations undergirding their constitutional claims, the Appellants allege the deprivation of civil rights guaranteed by New Jersey's constitution and laws and made actionable by the NJCRA. *See* N.J. Stat. Ann. § 10:6-2. The NJCRA and 42 U.S.C. § 1983—the Appellants' vehicle for their federal claims discussed above—are "sister provision[s]" that each protect substantive rights. *Tumpson v. Farina*, 95 A.3d 210, 225 (N.J. 2014); *see also Lozano v. New Jersey*, 9 F.4th 239, 243 (3d Cir. 2021) (describing the NJCRA and § 1983 as "parallel cause[s] of action"). Moreover, the parties

---

[9] The one state law the Appellants cite is inapposite. That statute defines the terms "[l]aw enforcement agency" and "[l]aw enforcement officer" for purposes "relating to the suspension or termination of certain law enforcement officers and firefighters," but says nothing about interviews or promotions. N.J. Stat. Ann. § 40A:14-200.

and the District Court agree that the Appellants' NJCRA claim should rise or fall with their federal constitutional claims.  In this case, we agree that our analysis of the latter "applies equally to" the former, and thus will affirm the District Court's dismissal of the NJCRA claim.  *Falcone v. Dickstein*, 92 F.4th 193, 205 n.8 (3d Cir. 2024) (applying analysis of a First Amendment retaliation claim to a parallel claim under the NJCRA).

### D.      42 U.S.C. § 1985

Finally, the Appellants allege that O'Hara's selection and confirmation was the product of a conspiracy to deprive them of their state and federal constitutional rights, in violation of 42 U.S.C. § 1985.  Under the relevant subsection of § 1985, a plaintiff must allege, among other things, a conspiracy "motivated by a racial or class based discriminatory animus."  *Lake v. Arnold*, 112 F.3d 682, 685 (3d Cir. 1997).  The Complaint fails to plead that "Batelli's boys" is a class that is "readily determin[able] by means of an objective criterion or set of criteria," *Farber v. City of Paterson*, 440 F.3d 131, 136 (3d Cir. 2006) (quoting *Aulson v. Blanchard*, 83 F.3d 1, 5–6 (1st Cir. 1996)), or that discrimination against "Batelli's boys" is "so invidious" that § 1985 could apply, *id.* at 135 (identifying "discrimination against a class on the basis of race, sex," or mental disability as sufficiently invidious, and discrimination because of political orientation as insufficiently so).  On that basis alone, the District Court was correct to dismiss the Appellants' § 1985 claim.

### III.    CONCLUSION

For the foregoing reasons, we will affirm the District Court's judgment.

16