OPINION
JANE B. STRANCH, Circuit Judge.
This appeal arises from Flying Dog Brewery’s allegation that its First *344 Amendment rights were violated when the members of the Michigan Liquor Control Commission initially denied Flying Dog’s application to register a beer label in Michigan. Flying Dog sued under 42 U.S.C. § 1988, alleging a violation of its First Amendment rights, and the case ultimately proceeded on a claim for damages. The district court granted summary judgment in favor of the Commissioners, extending to them both quasi-judicial and qualified immunity. Flying Dog Brewery, LLLP v. Mich. Liquor Control Comm’n, 870 F.Supp.2d 477 (W.D.Mich.2012). Flying Dog now appeals. For the reasons explained below, we REVERSE the judgment of the district court and remand for further proceedings.
I. BACKGROUND
Craft beer maker Flying Dog Brewery created a Belgian-style India Pale Ale, “Raging. Bitch,” in celebration of its twentieth anniversary. (R. 1 at Page ID 5, ¶ 16.) In manufacturing this and other craft beers, Flying Dog’s co-founder, George Stranahan, was influenced by his friend, “the iconoclastic journalist and literary figure Hunter S. Thompson.” Flying Dog claims that its products are “inextricably imbued with and promote[] the irreverent ‘gonzo’ spirit and outlook for which Thompson is noted.” (R. 1 at Page ID 3, ¶¶ 10-11.) Ralph Steadman, an artist with whom Thompson frequently collaborated, also worked with Flying Dog in the production of brewery-related products, including beer labels. (R. 1 at Page ID 4, ¶ 13.) The label for “Raging Bitch” beer depicts a wild dog presenting human female genitalia as well as possessing semblances of human female breasts. The label is inscribed:
Two inflammatory words ... one wild drink. Nectar imprisoned in a bottle. Let it out. It is cruel to keep a wild anirrial locked up. Uncap it. Release it ... stand back!! Wallow in its golden glow in a glass beneath a white foaming head. Remember, enjoying a RAGING BITCH, unleashed, untamed, unbridled — and in heat — is pure GONZO!! It has taken 20 years to get from there to here. Enjoy!-Ralph Steadman
(R. 1 at Page ID 5, ¶ 16.)
Before Flying Dog could sell “Raging Bitch” beer in Michigan, the company was required to seek a registration number and approval from the Michigan Liquor Control Commission. Mich. Admin. Code R. 436.1611. The issue before the Commission was approval of the beer label— its written inscription and the pictorial representation that provided context and meaning for the label’s language. The Commission derives its authority from the Michigan Constitution, which provides that the “legislature may by law establish a liquor control commission which, subject to statutory limitations, shall exercise complete control of the alcoholic beverage traffic within this state, including the retail sales thereof.” Mich. Const. art. 4, § 40 (1963). Pursuant to this constitutional authority, the Michigan Legislature created a five-member administrative body appointed by the governor with the advice and consent of the senate to regulate alcohol sales in Michigan. ' Mich. Comp. Laws § 436.1209. No more than three of the five members of the Commission may be members of the same political party. Id. Two members, one from each political party, serve as Hearing Commissioners to handle “violation cases.” Id. The other three members serve as Administrative Commissioners who are responsible for administering the laws applicable “to licensing, purchasing, enforcement, merchandising, and distribution.” Id. At least two of the Administrative Commissioners sit as an *345 appeal board to review initial decisions. Id.
At the time of relevant events, the Administrative Commissioners were Nida Samona, Donald Weatherspoon, and Patrick Gagliardi. Samona served as the Commission Chairperson. The Hearing Commissioners were Colleen Pobur and Edward Gaffney. Although Flying Dog initially named all five as defendants in this suit, only the Administrative Commissioners remain in the litigation. (R. 1 at Page ID 2-3, ¶¶ 6-7.)
In September 2009, Flying Dog requested approval to register “Raging Bitch” for distribution and sale in Michigan. Chairperson Samona and Commissioner Weath-erspoon reviewed Flying Dog’s request and denied it in a written order dated November 18, 2009, finding that the label violated Michigan Administrative Code Rule 436.1611(1)(d), a regulation which is no longer in effect. (R. 11-2 Page ID 28.) That rule authorized rejection of any beer label submitted for registration that was “deemed to promote violence, racism, sexism, intemperance or intoxication or to be detrimental to the health, safety or welfare of the general public.” (R. 11-4 Page ID 50.) The Commissioners denied Flying Dog’s application because “the proposed label which includes the brand name ‘Raging Bitch’ contains such language deemed detrimental to the health, safety, or welfare of the general public.” (R. 11-2 Page ID 28.) Flying Dog appealed.
Commissioners Gagliardi and Weather-spoon held an appeal hearing in April 2010. Flying Dog’s CEO, James Caruso, and his attorney appeared. Caruso stated that the company chose the “edgy” name and label because it reflected the nature of the Belgian yeast used to make the beer, and it promoted the Flying Dog brand. (R. 11-3 Page ID 33-34, 37.) Caruso also represented that his employees — “many ladies working with Flying Dog” — and female customers in bars where Flying Dog conducted market research loved the label and thought it was humorous. Caruso reported that the beer was selling well in other states, and “I apologize if anything about it was offensive to the State of Michigan. I understand the role we play and how necessary it is to certainly be the traffic control as to what comes into the state, especially as beer.” Id. at 37.
The Commission’s attorney reminded the Commissioners that they had previously declined to approve labels using the words “Bitch, Bubbly Bitch, Royal Bitch and Mad Bitch,” and drew the Commissioners’ attention to the back of the beer label containing the sentence, “Remember, enjoying a RAGING BITCH, unleashed, untamed, unbridled — and in heat — is pure GONZOÜ” The attorney reported visiting Flying Dog’s website where he found the remark, “Raging Bitch, if you’re lucky, your bitch will look this sexy after 20 years.” (R. 11-3 at Page ID 38-39.) Noting that not “many dogs ... live[ ] twenty years,” the attorney observed “[tjhere is a tenor, if you will, to the promotion that I think you have quite correctly caught and need to address.” Id. at Page ID 39.
Commissioner Weatherspoon observed that a “dog’s not going to drink this beer .... it says and in heat, which specifically refers to a female dog ... [s]o you got to get me from the dog in terms of the reference here, to humans.” Id. at 39, 41. Caruso explained that “it’s a play on words.... So Raging Bitch is a, well you can call it a brood bitch for Raging Bitch when a dog is in heat,” to which Commissioner Weatherspoon replied, “That’s not the words you used.” Id. at 41. Caruso argued that the Commission had previously approved Flying Dog’s beer label for “In-Heat Wheat” and at one time had approved the name “Blond Bitch” submit *346 ted by Horny Bitch Beer Company. Id. at 42-43. It was Flying Dog that proposed the review standard of the Commission with Caruso’s statements and conclusion that “there’s a difference between edgy and offensive, and it’s certainly a gray area and you gentlemen will determine where' that edge is.” Id. at 44. Commissioner Gagliardi replied, “That’s what we’re here to do, Mr. Caruso, ... when we’re in a gray area, [we] attempt to err on the side of the least offensive.... [W]e have not been willing to put this particular five-letter word on the front of the box.” Observing that the Commission had previously “licensed Flying Dog in the State of Michigan” and recognizing that “there’s a place for [Gonzo journalism],” Commissioner Gagliardi stated, “we don’t believe in censorship ... but we also are placing a product in front of ten million people in the State of Michigan. That product goes in front of all ages from children on up, they go to the supermarkets, they go to the party stores with their parents and yes, although beers are in a certain area, they still walk by them.” He concluded that, “we do have a responsibility here to place product in a public place with the names that are on it, and that’s what we take very seriously.” Id. at 44-45.
On July 7, 2010, the Commissioners denied Flying Dog’s appeal and affirmed the Commission’s November 2009 order, referring to that earlier order as finding that the proposed label “includes language deemed detrimental to the health, safety, or welfare of the general public due to the promiscuous nature of the product label.” R. 11-4 Page ID 50. The Commissioners denied registration on appeal because the beer label “contains such language deemed detrimental to the health, safety, or welfare of the general public.” (R. 11-4 Page ID 51.)
Flying Dog subsequently filed this § 1983 suit against the Commissioners in their individual capacities, alleging that rejection of its beer label violated its First Amendment rights. (R. 1 at Page ID 9, ¶ 32.) Flying Dog claimed that Rule 436.1611(1)(d) was constitutionally invalid, both facially and as applied. (R. 1 at Page ID 9, ¶¶ 31-35.) The brewery sought declaratory and injunctive relief, and demanded a jury trial on the issue of compensatory damages. (R. 1 at Page ID 9-10, Prayer for Relief ¶¶ 1-4.)
Flying Dog moved for a preliminary injunction to bar enforcement of Rule 436.1611(1)(d), but before the district court could rule on that motion, the Supreme Court decided Sorrell v. IMS Health, Inc., -U.S.-, 131 S.Ct. 2653, 180 L.Ed.2d 544 (2011). The Commission then rescinded Rule 436.1611(1)(d) because Sorrell required “a heightened degree of scrutiny” of “commercial speech regulated by the government” and because of Michigan’s “recent emphasis ... on regulatory reform.” (R. 39-1 at Page ID 280.) The Commission approved Flying Dog’s “Raging Bitch” label, prompting the district court to dismiss the motion for a preliminary injunction as moot. (R. 43 at Page ID 290; R. 39-2 at Page ID 283.) Only Flying Dog’s request for compensatory damages remained for resolution.
The Commissioners moved to dismiss, for judgment on the pleadings, and for summary judgment, arguing that they are protected by quasi-judicial and qualified immunity. (See R. 53 Page ID 323; R. 54 Page ID 333.) Flying Dog moved for partial summary judgment on the issue of liability. (R. 56.) The district court treated the Commissioners’ motion as one for summary judgment and granted it, and denied Flying Dog’s motion for partial summary judgment. Observing that this circuit had not decided whether members *347 of a state administrative body with the authority to make licensing decisions are entitled to quasi-judicial immunity, the district court extended quasi-judicial immunity to the Commissioners. Flying Dog Brewery, 870 F.Supp.2d at 482-84. Alternatively, the court ruled that the beer label was commercial speech subject to the analytical framework set forth in Central Hudson Gas & Electric Corp. v. Public Service Commission of New York, 447 U.S. 557, 562-65, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980), rejected Flying Dog’s invitation to apply the prior restraint doctrine, and held that the Commissioners were entitled to qualified immunity because the specific First Amendment right at issue was not clearly established at the time the Commissioners rendered their decisions. Id. at 484-88. The court declined to reach the constitutional question of whether the Commissioners violated Flying Dog’s First Amendment rights. Id. at 488-89. This appeal followed.
II. ANALYSIS
A. Standard of Review
We review de novo a district court’s decision to grant summary judgment. See Adams v. Hanson, 656 F.3d 397, 401 (6th Cir.2011). Summary judgment is proper if there are no genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(a). We consider the evidence in the light most favorable to the nonmov-ing party and draw all reasonable inferences in that party’s favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The ultimate question is “whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is só one-sided that one party must prevail as a matter of law.” Id. at 251-52, 106 S.Ct. 2505. We begin our analysis with the Commissioners’ defense of quasi-judicial immunity.
B. Quasi-judicial immunity
The Supreme Court has long observed that a judge “may not be held accountable in damages for a judicial act taken within his [or her] court’s jurisdiction. [Absolute] immunity applies however erroneous the act may have been, and however injurious in its consequences it may have proved to the plaintiff.” Cleavinger v. Saxner, 474 U.S. 193, 199-200, 106 S.Ct. 496, 88 L.Ed.2d 507 (1985) (internal quotation marks omitted). The Court’s case law “suggest[s] an intelligible distinction between judicial acts and the administrative, legislative, or executive functions that judges may on occasion be assigned by law to perform.” Forrester v. White, 484 U.S. 219, 227, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988). The Court has extended absolute immunity to some officials who are not judges, but who “perform functions closely associated' with the judicial process.” Cleavinger, 474 U.S. at 200-01, 106 S.Ct. 496. The level of immunity granted to various public officials is adjusted because it is “the nature of the function performed, not the identity of the actor who performed it, that inform[s the] immunity analysis.” Id. at 229, 106 S.Ct. 496. Quasi-judicial immunity “attaches to public officials whose roles are functionally comparable to that of a judge.” Keystone Redevelopment Partners, LLC v. Decker, 631 F.3d 89, 95 (3d Cir.2011) (internal quotation marks omitted).
To determine whether a public official is entitled to quasi-judicial immunity, we examine “the nature of the functions with which a particular official or class of officials has been lawfully entrusted,” and “evaluate the effect that exposure to particular forms of liability would likely have on the appropriate exercise of those func *348 tions.” Forrester, 484 U.S. at 224, 108 S.Ct. 588. We consider a non-exhaustive list of factors “characteristic of the judicial process” to determine whether a public official should be afforded quasi-judicial immunity:
(a) the need to assure that the individual can perform his functions without harassment or intimidation; (b) the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct; (c) insulation from political influence; (d) the importance of precedent; (e) the adversary nature of the process; and (f) the correctability of error on appeal.
Cleavinger, 474 U.S. at 202, 106 S.Ct. 496 (citation omitted). The Supreme Court has “been quite sparing in [its] recognition of absolute immunity,” and has declined “to extend it any further than its justification would warrant.” Burns v. Reed, 500 U.S. 478, 487, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991) (internal quotation marks and citation omitted). “The presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties.” Id. at 486-87, 111 S.Ct. 1934. Consequently, officials who seek “absolute exemption from personal liability for unconstitutional conduct must bear the burden of showing that public policy requires an exemption of that scope.” Butz v. Economou, 438 U.S. 478, 506, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978).
We lack the benefit of a Supreme Court or Sixth Circuit opinion on whether members of a state administrative body who initially grant or deny beer label registration are entitled to absolute immunity. Our most analogous case is Watts v. Burkhart, 978 F.2d 269, 271 (6th Cir.1992) (en banc), where we held that members of the Tennessee Board of Medical Examiners should be afforded the protection of quasi-judicial immunity for acts taken in suspending a medical license. Important factors supporting our decision were that the members of the Board, although appointed by the governor, did not serve at his or her pleasure, id. at 275, and the Tennessee Administrative Procedures Act provided adequate procedural safeguards for contested cases, id. at 276. We observed that “the act of revoking a physician’s license ... is likely to stimulate a litigious reaction from the disappointed physician, making the need for absolute immunity apparent.” Id. at 278 (internal quotation marks omitted). The Seventh Circuit reached similar holdings in cases challenging the actions of liquor commissioners in revoking or suspending licenses. In Killinger v. Johnson, 389 F.3d 765, 770 (7th Cir.2004), the court held that a local liquor commissioner’s decision to suspend a license, impose a fine, and summarily close a licensee’s business is protected by quasi-judicial immunity, and in Reed v. Village of Shorewood, 704 F.2d 943, 951 (7th Cir.1983), the court held that a local liquor commissioner was entitled to absolute immunity when considering the revocation of a liquor license.
In Keystone Redevelopment Partners, 631 F.3d at 91, the Third Circuit applied the Cleavinger factors to hold that members of the Pennsylvania Gaming Control Board were entitled to quasi-judicial immunity for their decisions to grant gaming licenses. That court determined that the first Cleavinger factor — the need to assure that the function could be performed without harassment or intimidation — weighed in favor of granting the commissioners absolute immunity due to the large financial stakes and the “strong incentive to counter-attack” an adverse decision. Id. at 96-97 (internal quotation marks omitted). Because parties seeking licensing possessed substantial financial resources and *349 could engage in extensive litigation, licensing decisions might be impacted if the board members knew they could be sued for monetary damages. Id. at 97. Moreover, the presence of institutional safeguards weighed in favor of immunity because the Gaming Board was required to give notice to the parties and the public, hold public-input hearings, and abide by specific procedures for conducting hearings. Id. at 98. In addition, the applicants were entitled to counsel, and the Board could subpoena witnesses and documents and accept only sworn testimony. Id. Finally, the Board had to issue a written decision and transcribe the record. Id. at 98 (citations omitted).
The Third Circuit'found that the third factor — insulation from political influence-was satisfied because board members served fixed terms and could be removed from office only for limited reasons, including misconduct and criminal conviction. They were prohibited from political involvement, and they were required to re-cuse themselves if their impartiality was called into question. Id. The fourth factor — reliance on precedent — was satisfied because the board was required to rely on specific statutory criteria in making decisions, employ a “clear and convincing” standard, and issue a written decision accompanying its order. Id. at 98-99.
The court found the licensing process to be sufficiently adversarial as well. Applicants were given reasonable notice and an opportunity to be heard, they were entitled to make objections to the Board’s rulings during the hearing, and they could present evidence, briefs, and engage in oral argument. Id. at 99. Finally, unsuccessful licensees had a right of appeal to the Pennsylvania Supreme Court. Id. at 100-01.
We find the Third Circuit’s analysis of the non-exhaustive Cleavinger factors useful. We apply a similar approach to decide only whether the Administrative Commissioners who grant or deny beer label registration applications are entitled to quasi-judicial immunity. We expressly do not consider whether quasi-judicial immunity is warranted for other factual situations the Administrative Commissioners may face, nor do we consider whether the Hearing Commissioners who suspend or revoke liquor licenses in disciplinary cases are entitled to quasi-judicial immunity. Those questions are not before us.

1. Performance of functions without harassment or intimidation

Flying Dog does not dispute “that every official should be able to perform legitimate functions ‘without harassment or intimidation,’ ” Appellant’s Br. at 62, but argues that the Administrative Commissioners are not entitled to quasi-judicial immunity because their licensing actions are ministerial in nature and there is “zero ‘empirical evidence demonstrating the existence of any significant volume of vexatious and burdensome actions against’ them.” Id. at 63. The Commissioners warn that they “simply could not function” if they are subject to individual liability for the many licensing decisions made each year, and no empirical evidence is necessary to prove it.
We do not agree that the Administrative Commissioners’ denial of Flying Dog’s application can be characterized as ministerial. The Commissioners exercised significant discretion when they rejected Flying Dog’s proposed beer label. Moreover, a lack of empirical evidence is not dispositive. In Buckles v. King County, 191 F.3d 1127, 1136 (9th Cir.1999), the Ninth Circuit predicted that a number of losing parties would sue zoning board members for damages if they were not protected by absolute immunity, and just as there were sig- *350 nifícant economic gaming interests at stake in Keystone Redevelopment Partners, 6B1 F.3d at 96-97, there are significant economic interests at stake in the development of a beer product and its label. Because the Administrative Commissioners’ ability to operate would undoubtedly be hindered if they were routinely sued for damages for denying beer registration applications, this factor favors the Commissioners.

2. Safeguards reducing the need for private damages actions

The second Cleavinger factor addresses whether a regulatory body’s operations are governed by procedural safeguards that will serve to control unconstitutional conduct, “such as the right to counsel, adequate notice of a hearing, and the opportunity to present and cross-examine witnesses.” O’Neal v. Miss. Bd. of Nursing, 113 F.3d 62, 66 (5th Cir.1997).
The Commission’s rules appear to provide more extensive procedural safeguards to parties who appear before the Hearing Commissioners due to liquor violations than to parties who appear before the Administrative Commissioners on initial licensing matters. See Mich. Admin. Code R. 436.1905 to 436.1923. In the case of a liquor violation, a complaint identifying the alleged violation must be served on the licensee “not less than 20 days before the scheduled hearing date.” Mich. Admin. Code R. 436.1905(4). The licensee must be advised in the notice that she has a right to be represented by an attorney. Mich. Admin. Code R. 436.1905(6). If the licensee is not represented by counsel, she must be advised by the hearing commissioner of the right to present evidence and the right to cross-examine commission witnesses. Mich. Admin. Code R. 436.1909(2). The hearing commissioner’s findings of fact, conclusions of law, and an order must be mailed to the licensee and her attorney, if any, within 45 days after the hearing unless the Commission enters a written order extending the period. Mich. Admin. Code R. 436.1909(1). Violation appeal hearings are conducted by the three Administrative Commissioners, and specified procedures govern violation appeal proceedings. Mich. Admin. Code R. 436.1917(2), 436.1921 & 436.1923. Procedural safeguards like these reduce the need for private damages actions. See O’Neal, 113 F.3d at 66.
By contrast, the Commission’s regulation addressing hearings for matters other than liquor violations provides:
Rule 25. (1) The commission, on its own motion, may order a hearing on a matter within its jurisdiction.
(2) Applications for a license issued under the act or commission rules shall be reviewed by the administrative commissioners. If a license application is denied, then the aggrieved license applicant may request an appeal hearing, and the commission shall grant the hearing. The request shall be made to the Lansing office of the Commission within 20 days from the date of the mailing of the decision of denial.
(3) The chairperson may designate 1 or more commissioners to hear matters other than a violation of the act or commission rules.
(4) In a hearing on matters other than a violation of the act or commission rules, the commission may determine which party has the burden of proceeding.
Mich. Admin. Code. R. 436.1925. The licensee may be represented by a licensed attorney, see Mich. Admin. Code. R. 436.1933, and the Commission, on written application, shall subpoena witnesses to a hearing or appeal hearing. See Mich. Admin. Code. R. 436.1929. The subpoena right' certainly implies that the licensee *351 may present evidence and cross-examine witnesses, but we have not located a regulation requiring the Commissioners to issue written findings of fact and conclusions of law to explain their reasons for granting or denying an initial registration application. Further, this case demonstrates that any appeal from an initial denial of a license may be heard by one or more of the same Administrative Commissioners who participated in the initial decision. An aggrieved party may, however, seek judicial review in an appropriate state circuit court “from any order, decision, or opinion of any state board, commission, or agency.” Mich. Comp. Laws § 600.631.
The existence of some procedural safeguards helps to reduce the need for private damages actions. But because the regulations do not require the Administrative Commissioners to explain their decisions through findings of fact and conclusions of law, unconstitutional decision-making may remain largely unchecked even where judicial review is available. Revisions to the Commission’s regulations might correct this deficiency, but under the regulations in force at the time of these events, this Cleavinger factor weighs in favor of denying quasi-judicial immunity to the Administrative Commissioners.

S. Insulation from political influence

The Commissioners have some of the characteristics courts have deemed important in determining whether a state official is insulated from the political process. No more than three of the five commissioners may be chosen from the same political party, and the commissioners are “appointed by the governor with the advice and consent of the senate.” Mich. Comp. Laws Ann. § 436.1209(2). The members “devote [their] entire time to the performance of the[ir] duties” as commissioners, id. § 436.1209(4), and hold four-year terms. Id. § 436.1209(5). They can be removed from their appointed positions only for “malfeasance, misfeasance, or neglect in office.” Id. Other cases have concluded that similar provisions sufficiently insulated officials from political influence. See, e.g., Watts, 978 F.2d at 275; Keystone, 631 F.3d at 98. This factor weighs in favor of quasi-judicial immunity.

I. Importance of precedent

We next consider the importance of precedent in the Commissioners’ decision-making process, an issue that dovetails with our previous discussion of the second Cleavinger factor. In Keystone, the Third Circuit observed that the gaming board was required to base its decision on specific statutory criteria, satisfy a clear and convincing standard, and issue a written opinion with its order. 631 F.3d at 99. By comparison, the Administrative Commissioners’ licensing decisions need not follow any specific statutory criteria or satisfy a clear and convincing standard, and the Commissioners’ written orders do not qualify as written legal opinions. Although the record suggests that the Administrative Commissioners strive to issue consistent decisions, they do not appear to be bound by any precedent typical of a legal inquiry. Hence, this factor, like the second, weighs in favor of denying quasi-judicial immunity.

5. Adversarial nature of the process

The resolution of the fifth Cleavinger factor follows from the disposition of the second and fourth factors. The initial licensing application process, as it is currently constructed, is not sufficiently adversarial to warrant a grant of quasi-judicial immunity to the Administrative Commissioners. This factor suggests a denial of quasi-judicial immunity.

*352
6. Availability of appellate review

Finally, we arrive at the question of appellate review. Under the pertinent Michigan regulation, a party whose registration application is denied may request an administrative appeal, and the Commission must grant an appeal hearing. Mich. Admin. Code R. § 436.1925. We previously noted that the appeal hearing panel is comprised of Administrative Commission-' ers who ruled on the initial registration request and not independent reviewers. Judicial review of the administrative appellate decision is, however, available. Mich. Comp. Law § 600.631. The existence of judicial review tilts this factor toward granting quasi-judicial immunity because any errors of the Administrative Commissioners may be “largely remediable through the appellate process.” Heyde v. Pittenger, 633 F.3d 512, 519 (7th Cir.2011) (quoting Reed v. Village of Shorewood, 704 F.2d 943, 952 (7th Cir.1983)). Flying Dog chose not to seek judicial review in state' court of the Administrative Commissioners’ decisions.
Because the six Cleavinger factors are divided evenly both for and against a grant of quasi-judicial immunity, we call this close question in favor of Flying Dog. We limit our decision on quasi-judicial immunity to the specific factual and legal circumstances presented by this case. Accordingly, we reverse the district court’s conclusion that quasi-judicial immunity is warranted here, and we turn to the question of qualified immunity.
C. Qualified Immunity
“Qualified immunity balances two , important interests — the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.” Pearson v. Callahan, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). The defense covers mistakes in judgment, whether of fact or law, Pearson, 555 U.S. at 231, 129 S.Ct. 808, and it protects “all but the plainly incompetent or those who knowingly violate the law.” Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). The qualified immunity doctrine precludes federal courts from awarding damages against a government official in his or her individual capacity unless that official violated a statutory or constitutional right and the right was clearly established at the time the conduct occurred. Lane v. Franks, — U.S. -, 134 S.Ct. 2369, 2381, 189 L.Ed.2d 312 (2014); Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).
The Administrative Commissioners bear the initial burden to provide facts suggesting that they acted within the scope of their discretionary authority when they ruled on Flying Dog’s application. See Gardenhire v. Schubert, 205 F.3d 303, 311 (6th Cir.2000). If they do so, the burden shifts to Flying Dog to demonstrate that the Commissioners’ “conduct violated a right so clearly established that any officials] in [their] position would have clearly understood that [they were] under an affirmative duty to refrain from such conduct.” Id. In assessing the qualified immunity defense, we have “discretion to decide which of the two prongs of qualified-immunity analysis to tackle first.” Ashcroft v. al-Kidd, — U.S. -, 131 S.Ct. 2074, 2080, 179 L.Ed.2d 1149 (2011). We begin with the district court’s analysis on the second part of the qualified immunity inquiry: whether the constitutional right the Administrative Commissioners are alleged to have violated was clearly established at the time the Commissioners acted.
A government official is liable for the violation of a constitutional right if “the *353 right was clearly established ... in light of the specific context of the case.” Binay v. Bettendorf, 601 F.3d 640, 646 (6th Cir.2010) (internal quotations marks omitted). A right is clearly established if the contours of the right are sufficiently clear that a reasonable official would understand that what he or she is doing violates that right. Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); Hearring v. Sliwowski, 712 F.3d 275, 279 (6th Cir.2013). We undertake the qualified immunity inquiry “in light of the specific context of the case, not as a broad general proposition.” Brosseau v. Haugen, 543 U.S. 194, 198, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) (internal quotation marks omitted). In doing so, we consider first the decisions of the Supreme Court, then our own decisions and those of other courts within the circuit, and then the decisions of other circuits. Andrews v. Hickman Cnty., 700 F.3d 845, 853 (6th Cir.2012). “We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.” al-Kidd, 131 S.Ct. at 2083. “ ‘In an obvious case, [general] standards can clearly establish the answer, even without a body of relevant case law.’ ” Sample v. Bailey, 409 F.3d 689, 699 (6th Cir.2005) (quoting Brosseau, 543 U.S. at 199, 125 S.Ct. 596).
The Supreme Court held nearly thirty-five years ago that government officials may regulate truthful, non-misleading commercial speech only if the regulation directly advances a substantial state interest and the regulation is not more extensive than necessary to serve that interest. Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm’n of N.Y., 447 U.S. 557, 565, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). In Central Hudson, the Court overturned the Public Service Commission’s complete ban on promotional advertising by an electric utility. Taking up the issue of “expression related solely to the economic interests of the speaker and its audience,” id. at 561, 100 S.Ct. 2343, the Court reiterated “the ‘commonsense’ distinction between speech proposing a commercial transaction, which occurs in an area traditionally subject to government regulation, and other varieties of speech.” Id. at 562, 100 S.Ct. 2343 (quoting Ohralik v. Ohio State Bar Ass’n, 436 U.S. 447, 455-56, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978)). “The Constitution ... accords a lesser protection to commercial speech than to other constitutionally guaranteed expression,” and the “protection available for particular commercial expression turns on the nature both of the expression and of the governmental interests served by its regulation.” Id. at 562-63, 100 S.Ct. 2343. Because First Amendment protection is extended to commercial speech to guard the informational function of advertising, the government may ban commercial speech that relates to illegal activity or that misleads the public about lawful activity. Id. at 563-64, 100 S.Ct. 2343.
“The Supreme Court recognized that [i]n most other contexts, the First Amendment prohibits regulation based on the content of the message,” but the government can regulate commercial speech based on content because “commercial speakers have extensive knowledge of both the market and their products” and are thereby “well situated to evaluate the accuracy of their messages and the lawfulness of the underlying activity.” Id. at 564 n. 6, 100 S.Ct. 2343. In addition, “commercial speech, the offspring of economic self-interest, is a hardy breed of expression that is not particularly susceptible to being crushed by overbroad regulation.” Id. (internal quotation marks omitted).
Honoring the distinctions between commercial speech and other forms of constitutionally protected expression, the Court *354 outlined a four-part test for courts to use in evaluating whether government regulation of commercial speech violates the First Amendment:
At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.
Id. at 566, 100 S.Ct. 2343.
In the year after the Supreme Court issued Central Hudson, we held that a municipality’s decision to revoke a restaurant’s permit to display the name “Sambo’s” violated the First Amendment. Sambo’s Rest., Inc. v. City of Ann Arbor, 663 F.2d 686, 695 (6th Cir.1981). Having reviewed a trial on the merits, we emphasized that “the City has produced no evidence to demonstrate that the actual operation of the restaurant under the name ‘Sambo’s’ has retarded or impeded achievement or furtherance of its goal o[f] racial equality.... The impact on these laudable goals by ‘Sambo’s’ is speculative at best.” Id. We explained that “[m]uch more than a speculative causal relationship is required” before a city may “shut off discourse” to protect those offended by the speech from hearing it. Id.
Years after we decided the Sambo’s case, the Supreme Court applied the Central Hudson test to hold that a total government ban on placing alcohol content on beer labels violated the First Amendment. Rubin v. Coors Brewing Co., 514 U.S. 476, 115 S.Ct. 1585, 131 L.Ed.2d 532 (1995). Rubin resolved any doubt that First Amendment commercial speech principles apply to the content of beer labels.
The following year, the Supreme Court ruled that Rhode Island’s statutory ban on advertisements displaying accurate information about retail prices of alcoholic beverages could not stand under the First Amendment. 44 Liquormart, Inc. v. Rhode Island, 517 U.S. 484, 489, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996). The Court characterized the advertising ban as “an abridgement of speech protected by the First Amendment” and ruled that the decision to ban was “not shielded from constitutional scrutiny by the Twenty-first Amendment.” Id. “[Although the Twenty-first Amendment limits the effect of the dormant Commerce Clause on a State’s regulatory power over the delivery or use of intoxicating beverages within its borders, the Amendment does riot license the States to ignore their obligations under other provisions of the Constitution.” Id. at 516, 116 S.Ct. 1495 (internal quotation marks omitted). Thus, the Twenty-first Amendment does not “diminish the force” of the Supremacy Clause, the Equal Protection Clause, or the Free Speech and Establishment Clauses of the First Amendment. Id. In the end, the Twenty-first Amendment could not save Rhode Island’s ban on the advertising of liquor prices. Id.
In the face of this strong line of First Amendment precedent, the Administrative Commissioners point to the Second Circuit’s grant of qualified immunity to state liquor commissioners who banned a vulgar beer label. Bad Frog Brewery, Inc. v. N.Y. State Liquor Auth., 134 F.3d 87 (2d Cir.1998). The Commissioners contend that Bad Frog Brewery demonstrates that the law in this area was not clearly established at the time the Commissioners acted. We disagree.
*355 In Bad Frog Brewery, the district court held that the rejection of Bad Frog’s beer label, which showed a frog “giving the finger,” did not violate the First Amendment. Id. at 102. The Second Circuit reversed on the constitutional question, but nonetheless concluded in one sentence that “[t]he District Court’s decision upholding the denial of the application, though erroneous in our view, sufficiently demonstrates that it was reasonable for the commissioners to believe that they were entitled to reject the application.” Id. The court offered no further elaboration on its qualified immunity analysis so there is little we can take from that grant of qualified immunity to guide our decision here. Bad Frog Brewery is persuasive authority only for the point that state liquor commissioners should have been on notice after 1998 that banning a beer label for vulgarity violates the First Amendment.
By the time the Administrative Commissioners banned Flying Dog’s beer label in 2009, the clear line of Supreme Court commercial speech precedents, coupled with our own decision in Sambo’s and the persuasive opinion of the Second Circuit in Bad Frog Brewery, should have placed any reasonable state liquor commissioner on notice that banning a beer label based on its content would violate the First Amendment unless the Central Hudson test was satisfied. Consequently, we disagree with the district court’s determination that applicable First Amendment law was not clearly established in 2009 and set aside the grant of qualified immunity to the Commissioners.
B. Remand is warranted
Having resolved the case on immunity grounds, the district court did not reach the issue decided by the dissent— whether the Administrative Commissioners violated Flying Dog’s clearly established First Amendment rights. The district court should undertake this inquiry in the first instance.
We do not agree with the dissent that the factual record was sufficiently developed and undisputed on summary judgment to entitle Flying Dog to judgment as a matter of law. The dissent recognizes that the Commissioners’ affidavits submitted in connection with the summary judgment motions create issues of fact, particularly with respect to the Commissioners’ asserted reasons for denying the beer label registration and the evidentiary support for those reasons. We disagree with the dissent’s application of the Central Hudson factors at this stage due to the lack of critical evidence and fact-finding by the district court. The record in this civil rights lawsuit is not confined to the few facts .developed in the administrative proceedings, nor are we free to find the facts on appeal. As in any other case, the litigants are entitled to the full process that enables the district court to resolve all disputes of fact impacting the Central Hudson analysis.
Supreme Court cases provide guidance for the task of assessing the propriety of governmental restrictions on commercial speech by, for example, illustrating methods for answering the Central Hudson inquiry — is there a sufficient “fit” between the regulatory goal and the means chosen to accomplish it. Comparable cases establish that the Commissioners here may be able to justify their restriction on Flying Dog’s speech through various kinds of proof, including reference to empirical data, studies, and anecdotes, and perhaps even through “history, consensus, and simple common sense.” Fla. Bar v. Went For It, Inc., 515 U.S. 618, 628, 115 S.Ct. 2371, 132 L.Ed.2d 541 (1995) (internal quotation marks omitted); Gibson v. Texas Dep’t of
*356 Ins., 700 F.3d 227, 237 (5th Cir.2012). In both 44 Liquonnart, Inc. and Rubin, the Supreme Court had before it factual records developed in the district courts accompanied by findings of fact and conclusions of law. In JfJf Liquomiart, Inc., the district court made its findings and conclusions after considering videotaped depositions and other evidence presented at a hearing, including “conflicting expert testimony” on whether a regulation was more extensive than necessary to serve a substantial governmental interest. 517 U.S. at 493-94, 116 S.Ct. 1495. Similarly, the Rubin case arrived at the Supreme Court on a developed factual record after two appeals in the Tenth Circuit, beginning with Adolph Coors Co. v. Brady, 944 F.2d 1543 (10th Cir.1991). Rubin, 514 U.S. at 479, 115 S.Ct. 1585. In Brady, the Tenth Circuit applied Central Hudson to determine that the government’s asserted interest in banning alcohol content on beer labels was “substantial,” but because “the record provided insufficient evidence to determine” whether the ban on disclosure directly advanced the government’s interest, the court remanded the case for further proceedings to ascertain whether the “fit” requirement was met. Id. After “further factfinding,” the district court upheld a ban for advertising, but invalidated a ban for beer labels. Id. On the subsequent appeal concerning only the labeling ban, the Tenth Circuit affirmed, Adolph Coors Co. v. Bentsen, 2 F.3d 355 (10th Cir.1993), and the Supreme Court granted certiorari and affirmed. Id. at 479-80, 115 S.Ct. 1585. Likewise, in Sambo’s Restaurants, we decided the appeal after a trial on the merits in the district court on stipulated facts. Sambo’s Restaurants, Inc., 663 F.2d at 687.
We are not certain whether, in this case, the parties had completed discovery by the time they filed the motions for summary judgment or whether additional factual development of the record is warranted. And of course we do not have the benefit of the district court’s opinion examining the Commissioners’ proof on the “fit” requirement to determine whether there are genuine issues of material fact remaining for trial. If there are, then the district court must conduct a bench trial followed by findings of fact and conclusions of law.
In light of the governing Supreme Court authority and our decision to set aside the district court’s immunity rulings, we remand the case to the district court for further proceedings on the issue of whether the Administrative Commissioners violated Flying Dog Brewery’s clearly established First Amendment rights.
III. CONCLUSION
Accordingly, we REVERSE the district court’s decision to grant the Commissioners quasi-judicial and qualified immunity and we REMAND the case to the district court for further proceedings consistent with this opinion.